AUGUST HECKSCHER, Appellant, *v.* WILLIAM EDENBORN,
Respondent.

*Principal and agent* — syndicate contract by which subscribers
agree to take. stock in corporation organized to take business
and property of existing corporations — when person acting as
agent and organizer for subscribers sells property of his own to
new corporation without knowledge of his principals, the syndi-
cate agreement is voidable.

1. A person occupying a position of agent to purchase may not
sell his own property to his principal. If one by misrepresentation
or suppression of facts, when he ought to speak, induces another
ignorantly to make a contract appointing the first his agent to buy
and conferring upon him discretionary power to purchase his own
property, the contract is voidable; and even if executed may be
rescinded and the money recovered back upon restoration of what
has been received.

2. In this action, brought to recover amounts subscribed and paid
by plaintiff and his assignors to defendant under a syndicate agree-
ment on the ground that they were induced so to do by fraud of
defendant, the jury was entitled to find that the defendant was the
chief promoter and organizer of an enterprise which contemplated as
its basis the purchase of a million dollars par value of the stock of a
corporation of which he was the majority owner; that the syndi-
cate agreement made defendant and his two associate managers
agents of the various subscribers and gave them discretionary
power to purchase this stock; that defendant in effect invited or
solicited plaintiff's assignors to become subscribers to the agree-
ment; that at the time they were ignorant of his interest in the
property to be acquired, and that he did not inform them of such
interest, but on the contrary his apparent subscription on the
paper showed to them, and various statements which he made,
tended to exclude the idea that defendant was the owner of a large
amount of property to be acquired, and which would in effect offset
or pay his large subscription, when, as a matter of fact, he always
intended to transfer his stock to the syndicate as he did. *Held*,
that if these facts should be found a court would be entitled to find
fraud as a matter of fact, for which the agreement could be
rescinded and moneys paid thereunder recovered back.

3. Defendant and his associates acquired not only his stock
in the corporation but also other property, and all of this was

transferred to a reorganized corporation and represented by new stock issued to the syndicate subscribers. Plaintiff and his assignors tendered to defendant the stock so issued to them and demanded the return of the money subscribed. *Held*, that such tender was a sufficient offer to restore defendant to his original position, so as to entitle plaintiff and his assignors to recover the moneys which had been paid to him; that the agreement cannot be subdivided and a rescission allowed as to part and not as to the rest; that on a rescission of the agreement and on restoration of what they received plaintiff and his assignors would be entitled to recover the entire amounts paid to defendant, even though part of such moneys were applied to the purchase of other property than that owned by defendant.

*Heckscher* v. *Edenborn*, 137 App. Div. 899, reversed.

(Argued June 14, 1911; decided October 17, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered March 31, 1910, affirming a judgment in favor of defendant entered upon a verdict directed by the court.

The action was brought by plaintiff in behalf of himself individually and also as assignee of several others to recover the amounts which they severally subscribed and paid under a syndicate agreement, on the ground that they were induced so to subscribe and pay by the fraud of the defendant. On the first trial of the action plaintiff secured a verdict and judgment for the full amount of these claims, but this was reversed by the Appellate Division, and on the second trial, in accordance with the views of the latter court, a verdict was directed in behalf of defendant.

The defendant was the principal promoter and organizer of a syndicate which had for its purpose the raising of $2,500,000 to be expended in the acquisition, improvement and development of certain iron properties. The basic property in the enterprise and the one which indirectly has furnished the occasion for this litigation was the United States Iron Company of New Jersey, with a capital of $1,000,000, of which defendant owned more than one-half.

The syndicate agreement which was formulated by or under the supervision of the defendant in its opening paragraph is stated to be "by and between William Edenborn, August Mann and J. C. Walker (hereinafter called the 'Syndicate Managers'), parties of the first part, and the subscribers hereto, severally, parties of the second part * * * and all of whom, together with the said parties of the first part, constitute the Syndicate." It sets forth the advantageous opportunities for acquiring the ownership and control of the various properties involved, specifically mentioning the "ownership, control and possession of the United States Iron Company of New Jersey at par," and the location of blast furnaces thereon; the necessity for raising $2,500,000 and the desirability that "a syndicate be formed which shall furnish and supply said sums * * * for the purposes above mentioned." It then recites: "This agreement witnesseth, that in consideration of the premises and the mutual promises herein contained, the parties hereto agree and the subscribers, severally, agree with each other and with the Syndicate Managers as follows:

"*First.* The parties hereto hereby form a Syndicate to purchase, acquire, use, develop and dispose of the lands and properties above mentioned or so much or such part thereof as, in the judgment and opinion of the said Syndicate Managers, is deemed advisable and proper.

"*Second.* Each subscriber shall set opposite his name the amount of his subscription to the said Syndicate."

Said agreement then in substance amongst other things provides that calls on subscribers shall be made by the syndicate managers who "shall issue, or cause to be issued to the subscribers, receipts in respect of payments made hereunder or certificates of interest in said Syndicate, of such tenor and form as they deem suitable;" that the syndicate managers "shall have the direction and management of the subject-matter of said Syndicate, and each subscriber nominates and appoints the Syndi-

cate Managers, his agents and attorneys, \* \* \* to exercise all the rights of the subscribers in and to the properties proposed to be acquired, and to enter into and execute any and all arrangements or agreements deemed by the Syndicate Managers expedient or necessary to carry out and perform the object and purpose of this Syndicate;" that said syndicate managers "shall take the title to any of the lands and properties to be acquired by the Syndicate in such form and in the names of such persons, firms or corporations as in their judgment and opinion shall be deemed proper and advisable;" that in case said syndicate managers "in the exercise of their absolute power and discretion hereunder, sell, convey or transfer any of the money or properties acquired by the Syndicate, for either cash, bonds, stocks or securities, each of the subscribers hereto shall be entitled to receive, on the termination of this agreement and the dissolution of the Syndicate, his *pro rata* share thereof. And, if the money and property acquired by the Syndicate, or any part thereof, is caused to be sold and conveyed to any corporation which may be formed for the purpose of acquiring the same from the Syndicate, and issuing in payment therefor its stocks, bonds or other forms of securities, then and in that event the Syndicate Managers shall have and retain the exclusive right and power to supervise and superintend each and all of the steps and proceedings in respect to the organization of any such corporation." In addition to the enumeration of specific powers said agreement confers " all other general and specific powers which, from time to time they (the managers) may deem necessary in order fully and effectively to carry out the purposes of this agreement and of this Syndicate." The assent of two of the three syndicate managers was necessary to any act to be performed by them.

The defendant was in terms the largest subscriber to this agreement, and the plaintiff and his assignors severally subscribed and paid in substantial sums.

The defendant did not in any manner solicit or invite the plaintiff himself to subscribe, but the latter so subscribed of his own volition and at his own suggestion. In answer to his inquiries the defendant did say, and this is claimed to be material in view of what subsequently took place, that "every one (of the subscribers) was to pay cash, and it was exactly on the same basis; that there would be no commissions nor any profit to any one."

The defendant did in effect solicit the subscriptions of plaintiff's assignors, in general terms characterizing the enterprise as a promising one, and in connection with the agreement, which showed his own subscription of $500,000, did state in substance in varying terms to some of the assignors that every subscriber was to pay his subscription in cash.

The syndicate agreement having been executed by a sufficient number of persons, the parties thereto proceeded to carry the same out.

The syndicate managers seem to have effected an organization by making the respondent chairman. From time to time calls were made by and in behalf of the managers for payments by the various subscribers on account of their syndicate subscriptions, and payments were made by the plaintiff and his assignors. The checks by which these payments were made were in most cases payable to the order of the respondent as chairman, but in some cases seem to have been payable to him individually. But however this may be, it is apparent that the payments were all in legal effect made to the syndicate managers, and that the moneys paid in were legally and constructively in their possession, and were expended by their joint action as such managers.

The moneys which were collected were expended in purchasing properties in accordance with and within the terms of the agreement. Of the $2,500,000 subscribed $647,500 in effect was expended for purchasing the entire

capital stock of the United States Iron Company at $70 per share instead of par. The balance of the aggregate subscriptions, with the exception of something over $900,000, which was reserved for future use, was expended in purchasing other properties. As has already been indicated, respondent purported to pay his subscription of $500,000 to a large extent by turning in his holdings of the capital stock of the iron company at $70 per share.

Thereafter, and in purported compliance with the terms of the syndicate agreement, the managers, instead of organizing a new corporation to take over the properties which had been acquired and the balance of the subscriptions remaining in cash assets, caused the United States Iron Company to be reorganized under the name of the Sheffield Coal & Iron Company, and caused its capital stock to be increased from $1,000,000 to $2,500,000 par value, and thereafter said managers transferred the properties which they had acquired and the cash assets above mentioned, all aggregating a face value of $2,500,000, to said Sheffield Coal & Iron Company, which thereupon issued certificates of its capital stock made out to and in the name of the various syndicate subscribers for an amount representing at par their respective subscriptions, and these certificates of stock through the syndicate managers were delivered to the various subscribers, including the plaintiff and his assignors.

For some reason the enterprise did not prove successful, and plaintiff and his assignors then first discovered, as they claim, that respondent owned a majority of the capital stock of the United States Iron Company which had been purchased by him and his associate managers in behalf of the syndicate, as above stated. After making this alleged discovery, claiming that respondent had been guilty of fraud in procuring them to become subscribers to the syndicate agreement which authorized him and his associate managers in their discretion to buy property from himself without disclosing this ownership and inter-

est, plaintiff and his assignors tendered back to respondent the stock which had been issued and delivered to them respectively as above stated, and demanded from him payment back of the moneys subscribed and paid by them respectively under the agreement.

. *Henry Wollman, Timothy M. Griffing, Edward S. Seidman* and *Henry M. Blackmar* for appellant. Edenborn's failure to disclose his interest in the property which he had himself appointed agent to purchase, was a fraud upon his principals. This rendered the entire transaction voidable *ab initio* as to each person who did not know the facts. (*Britton* v. *Ferrin*, 171 N. Y. 235; *Munson* v. *S. G. & C. R. R. Co.*, 103 N. Y. 58; *Munson* v. *Magee*, 161 N. Y. 182; *Clark* v. *Bird*, 66 App. Div. 284; *Porter* v. *Woodruff*, 36 N. J. Eq. 174; *Ex parte James*, 8 Vesey, 337; *Smith* v. *S. L. S. & E. Ry. Co.*, 72 Hun, 202; *M. E. Ry. Co.* v. *M. Ry. Co.*, 14 Abb. [N. C.] 103; *McDonald* v. *Lord*, 26 How. Pr. 404; *Morganstern* v. *Hill*, 8 Misc. Rep. 365.) If Edenborn had been merely a "constructive" trustee instead of an "express" trustee, and even if he had not come into personal contact with the plaintiff and his assignors he would nevertheless have been liable to them. (*Brewster* v. *Hatch*, 122 N. Y. 349; *Mack* v. *Latta*, 178 N. Y. 525; *Schwenk* v. *Naylor*, 102 N. Y. 683; *Hedden* v. *Griffin*, 136 Mass. 229; *Nash* v. *M. T. Ins. & T. Co.*, 163 Mass. 574.) The burden was upon Edenborn to show that before he got the plaintiff and his assignors to appoint him their agent to purchase the United States Iron Company, he made a full, fair and thorough disclosure to the plaintiff and each of his assignors of his interest in the property to be bought and of everything connected with the entire matter, and that each of them understood everything thoroughly. (*Barnard* v. *Gantz*, 140 N. Y. 249; *C. C. Co.* v. *Sherman*, 30 Barb. 553; *Clark* v. *Bird*, 66 App. Div. 284; *Kissam* v. *Squires*, 102 App. Div. 536; *Ten Eyck* v. *Whitbeck*, 156 N. Y. 341;

*Bauchle* v. *Smylie,* 104 App. Div. 513; *Matter of L. I. L. & T. Co.* [*In re Garretson*], 92 App. Div. 1; 179 N. Y. 520; *Rose* v. *M. T. Co.,* 130 N. Y. S. R. 946.)

*Frederic B. Jennings* and *Allen Wardwell* for respondent. Even if there were proof of actual fraud inducing the subscriptions the plaintiff would not be entitled to recover in this suit upon any theory of rescission of the syndicate agreement, because that agreement was not made with the defendant, and the money, which plaintiff seeks to recover, was not paid to the defendant or received by him. (*Sim* v. *Edenborn,* 163 Fed. Rep. 655; Kerr on Fraud & Mistake, 331; *Upton* v. *Tribilcock,* 91 U. S. 45; 1 Bigelow on Fraud, 123, 135; Smith on Frauds, § 267; *Southern Development Co.* v. *Silva,* 125 U. S. 247; *Hubbell* v. *Meigs,* 50 N. Y. 480; *Tyrrell* v. *Bank of London,* 10 H. L. Cas. 26.) The only contract which could have been rescinded in this case as against Edenborn was not the syndicate agreement, but the contract under which the syndicate purchased Edenborn's interest in the United States Iron Company. A rescission of that contract by the plaintiff alone, as one of the members of the syndicate, would be impossible because he was not a party to it and also because the *statu quo* could not be restored; but, even if possible, the plaintiff would not be entitled upon such rescission to recover the amount of his subscription to the syndicate agreement. (*New Sombrero Phosphate Co.* v. *Erlanger,* L. R. [5 Ch. Div.] 73; *Bagnall* v. *Carlton,* L. R. [6 Ch. Div.] 371; *Twycross* v. *Grant,* L. R. [2 C. P. Div.] 469; *W. B. C. P. Co.* v. *Green & Smith,* L. R. [5 Q. B. Div.] 109; *Emma Silver Mining Co.* v. *Grant,* L. R. [11 Ch. Div.] 918; *Lydney & Wigpool Iron Co.* v. *Bird,* L. R. [33 Ch. Div.] 85; *Joplin Land Co.* v. *Case,* 104 Mo. 572; *Cortes Co.* v. *Thannhauser,* 45 Fed. Rep. 730; *Simons* v. *Vulcan Oil, etc., Co.,* 61 Penn. St. 202; *Pittsburg Mining Co.* v. *Spooner,* 74 Wis. 307; *Parker* v. *Michigan,* 112 Mass. 195; *Yale Gas Stove Co.* v. *Wilcox,* 64 Conn. 101;

*Chandler* v. *Bacon,* 30 Fed. Rep. 538; *Ex-Mission Land Co.* v. *Flash,* 97 Cal. 610.) The plaintiff's tender to and demand upon the defendant Edenborn did not place him in *statu quo.* (*Cobb* v. *Hatfield,* 46 N. Y. 537; *Francis* v. *N. Y. & B. E. R. R. Co.,* 108 N. Y. 97; *Hammond* v. *Pennock,* 61 N. Y. 145; *Pullman* v. *Alley,* 53 N. Y. 637; *Gould* v. *Cayuga Nat. Bank,* 86 N. Y. 75; *Hogan* v. *Weyer,* 5 Hill, 389; *Bedell* v. *Bedell,* 3 Hun, 580; *Matter of Cape Breton Co.*; L. R. [29 Ch. Div.] 795; *Ladywell Mining Co.* v. *Brookes,* L. R. [35 Ch. Div.] 400; *Bentinck* v. *Fenn,* L. R. [12 App. Cas.] 652.) The defendant Edenborn and his associate syndicate managers, by the syndicate agreement, were expressly authorized to purchase the interest of any member of the syndicate or of the syndicate managers in the United States Iron Company and expressly relieved from liability so long as they acted in good faith. (*White* v. *Wood,* 129 N. Y. 527.) The action of the syndicate managers in purchasing the stock of the United States Iron Company held by Edenborn was duly ratified, and the plaintiffs are bound by such ratification. (*May* v. *Chapman,* 16 M. & W. 361; *Gale* v. *Morris,* 30 N. J. Eq. 289; *Haslett* v. *Stephany,* 55 N. J. Eq. 68; *Durfee* v. *O. C. R. Co.,* 5 Allen, 242; *San Diego* v. *P. B. Co.,* 112 Cal. 53; *Stetson* v. *N. I. Co.,* 104 Iowa, 393.)

HISCOCK, J. Plaintiff in his own behalf and as assignee of several others asks that he and they be relieved and released from the contract which they respectively made as subscribers to the syndicate agreement hereinbefore summarized and that they be repaid by defendant, who was one of the three syndicate managers, the amounts which they paid in as subscribers to said agreement. They demand this relief on the ground that the latter induced them respectively to become parties to said agreement and that while doing so he was guilty of such fraud as to make the contract voidable at

their election, and to entitle them to recover their moneys. While plaintiff's counsel on the argument has charged the defendant with many misdeeds, there is only one charge of fraud which finds any basis in the most favorable evidence. This is in substance that defendant procured plaintiff and his assignors to sign the agreement whereby the former and two others were appointed syndicate managers and were in their discretion authorized to purchase certain properties in behalf of plaintiff and the other subscribers, and that at the time when he and his associates were thus authorized to and at the time when they did in fact purchase, defendant was a large owner in one of the properties in question and that he concealed or failed to impart information of this fact and adverse interest of which plaintiff and his assignors were ignorant. I do not find any evidence that the defendant was guilty of that active fraud disclosed in many cases where conscienceless promoters have accumulated property at a low price under a well-devised scheme to unload it upon others at a high price. There is nothing to indicate that defendant acquired his stock in the United States Iron Company for any such purpose or that the stock purchased by him and his associate managers in that company was not fairly worth the price paid for it which was $30 per share less than the price fixed in the syndicate agreement. But broadly speaking, the complainants must rest their claim to relief on the basic principle that defendant induced them ignorantly to execute an agreement which violated the rule that an agent to buy may not purchase of himself.

Since that question is somewhat debated, it will be best in the first place to determine the exact character of the action which appellant is seeking to maintain and then decide whether on the facts he can successfully maintain it.

It seems clear that the action must succeed if at all as one based on an attempted and purported rescission of a

contract rendered voidable by reason of fraud wherein the defrauded party having tendered back what he received under the voidable contract attempts to recover that with which he has parted. It must stand as one directed against the syndicate agreement itself. If that was valid plaintiff cannot succeed because under it and subsequently defendant did some illegal act in violation of it.

Assuming that the complainants were induced by fraud to enter into the syndicate agreement three lines of relief were open to them. They might retain that which they received and bring an action at law against the guilty party to recover damages sustained by reason of his fraud; they might bring an action for rescission of the contract in which it would be sufficient to tender back anything which they might have received under the contract; they might bring an action based on a prior rescission wherein, having previously tendered back what they had received, they would recover that which had been taken from them. (*Vail* v. *Reynolds*, 118 N. Y. 297.)

This action is not one for damages or one to secure the rescission of a contract, but is one based on a prior rescission. In each cause of action plaintiff alleges in substance that he or his assignor, as the case might be, after learning of the interest of respondent in the properties to be purchased "and the falsity of his representations hereinbefore set forth," tendered back to him all of the stock received under said syndicate agreement on account of his payment of the amount subscribed "and demanded of said Edenborn the return to him of said sum * * * so paid by him as aforesaid." Said complaint also in like manner alleges that the plaintiff and his respective assignors have respectively "rescinded said Syndicate agreement and his subscription thereto, and is entitled to receive from said defendant said sum" subscribed and paid as aforesaid, and in conclusion the com-

plaint demands judgment for the aggregate amount of the sums paid in by said parties.

Therefore, both by the process of exclusion and by reason of its allegations the action must be treated as one based on rescission.

Such being the nature of the action, the next question is whether plaintiff or his assignors on any aspect of the evidence were entitled for fraud, actual or constructive, to rescind their syndicate contract and recover moneys paid thereunder on restoration of what they had received. I think that the latter were, yielding some doubts in the case of the assignor Moen to the judgment of my associates, and that the former was not, for, as I shall attempt to show, there is a difference in their respective positions.

The jury were entitled to find, amongst other facts, that the defendant was the chief promoter and organizer of an enterprise which, however reputable and legitimate, contemplated as its very basis the purchase of a million dollars par value of the stock of a certain corporation of which he was the majority owner; that the syndicate agreement made defendant and his two associate managers agents of the various subscribers and gave them discretionary power to purchase this stock; that defendant, who had held rather intimate and influential relations with some at least of plaintiff's assignors, in effect invited or solicited them to become parties to the project and subscribers to the agreement; that at the time they were ignorant of his interest in the property to be acquired and that he did not inform them of such interest, but on the contrary his apparent subscription of $500,000 on the paper showed to them, and various statements which he made, as that he was "putting in cash the same as" one of the subscribers, and that "any man in joining (the syndicate) puts in a dollar against the other man's dollar," and that there were no "inside profits," at least tended to exclude the idea that defendant

was the owner of a large amount of property to be acquired and which would in effect offset or pay his large subscription, when as a matter of fact he always intended to transfer his stock to the syndicate as he did. It seems to me that if these facts should be found a court would be entitled to find fraud as a matter of fact for which the agreement could be rescinded and moneys paid thereunder recovered back.

The principle that a person occupying a position of agent to purchase may not sell his own property to his principal is so elementary that it need only be stated. It must be quite as elementary and true that if one by misrepresentation or suppression of facts when he ought to speak induces another ignorantly to make a contract appointing the first his agent to buy and conferring upon him discretionary power to purchase his own property, the contract is voidable and even if executed may be rescinded and the money recovered back on restoration of what has been received.

The defendant comes within these principles. When he solicited plaintiff's assignors to become parties to the syndicate and appoint him one of their agents under the circumstances referred to, he must be held to have represented that he was legally qualified to discharge the powers which were being conferred upon him, and the obligation affirmatively rested upon him to inform them of his interest in the property which he was securing authority to buy if he would hold them to their contract and avoid that imputation of legal misconduct which the law fastens on an agent who attempts to serve the interests of both the principal and himself.

He did not occupy the position of an ordinary vendor but he was inviting others to confer upon him a fiduciary relationship. If he knew and they were ignorant of some fact which touched the very substance of that relationship and legally destroyed his ability to meet its full requirements, it was his duty to advise them of it, and

for his failure so to do they were entitled to repudiate the agreement and avoid what had been done under it. (*Virginia Land Co. v. Haupt,* 90 Va. 533, 537; *Brewster* v. *Hatch,* 122 N. Y. 349; *Bentinck* v. *Fenn,* L. R. [12 App. Cases] 652, 658, 661.)

It is urged that these principles do not apply to this case because the defendant was not an agent to buy generally in the market but was appointed to buy specific property at a specific price and, therefore, vested with no discretion which he could abuse because of opposing personal motives. This is hardly the fact. The syndicate agreement makes it plain by specific clauses as well as by general construction that defendant and his associate managers were intrusted with a discretion which they were called on to exercise in the interest of the various subscribers and which the law holds might be warped by conflicting interests.

While it is debated somewhat by him in the briefs, there is no real question but that subsequent transactions did amount to a purchase by defendant in behalf of his principals of property which belonged to him. It is said that he but exchanged stock in the original company for stock in the reorganized company, and that this did not amount to a purchase of his property at the expense of plaintiff and his assignors, but this does not seem to me to be the fact. Having subscribed a large amount in the syndicate, he turned in to himself and his associate managers his stock largely in payment of his subscription. This was the same as, and on the very theory that it amounted to paying his subscription to the managers in cash and then the purchase by the managers of his stock out of the cash which had been subscribed. Subsequently the stock acquired from him and others in part with the money subscribed by plaintiff and his assignors was turned over to the reorganized steel company, which became the depositary of the syndicate subscribers' rights, and new stock issued to defendant and all other

subscribers in proportion to their subscriptions. Treated as a whole and in its entirety, it is clear that the transaction amounted to a purchase with the syndicate subscriptions of defendant's stock as well as of the other properties involved. This was his own theory, for the minutes of the syndicate managers show that at a given meeting "the Chairman (defendant) reported that he had purchased all the outstanding stock of the United States Iron Company." Even if this were technically otherwise, it is clear that the defendant, as its largest stockholder, had a personal, adverse interest because of benefits expected to accrue in the application of the syndicate subscriptions to the acquisition, reorganization and development of the iron company.

As I have indicated, I think the plaintiff himself stands in a less advantageous position than his assignors. He sought participation in the agreement. He was never urged or invited by respondent or by any one else to invest his money in the enterprise. The only affirmative statement or representation of alleged importance made by respondent to him when he subscribed to the agreement was to the effect that the former's subscription of $500,000 then appearing on the agreement would be paid in cash. I do not think that this statement would amount to a fraudulent misrepresentation entitling appellant to rescind the agreement if the subscription was paid by turning in stock instead of cash, provided the purchase by the syndicate managers of respondent's stock was proper. Therefore, the question in plaintiff's case becomes whether respondent was guilty of a fraudulent suppression of material facts because he did not voluntarily inform him that he had an interest in some of the property which was to be purchased by himself and the other syndicate managers. It does not seem to me that this was the case. There was no fiduciary or confidential relationship between appellant and respondent when the former sought permission to become a subscriber. They dealt as

entire strangers. There was no solicitation by the defendant that the appellant should make him his agent, and, therefore, no implied representation that he was legally qualified to be one. Under these circumstances the burden rested on appellant to ascertain by proper investigation whether the scheme to which he was about to subscribe was a good one and whether respondent was a proper person to be intrusted as his agent with power to carry out the same, and respondent had the right to assume that he had made such investigation and understood the facts involved, and, therefore, was not guilty of fraud because he did not inform him of the facts which form the basis of the present complaint.

But, further, the respondent argues that plaintiff's theory presupposes a contract between his assignors and defendant which the former have been induced by the latter's fraud to make for the payment or delivery to him of money or property and the actual payment or delivery in accordance with the contract rescinded of such money or property to the latter for his individual account, and that neither of these conditions exist. And in amplification of this contention it is insisted that the syndicate subscriptions were received by respondent under the syndicate agreement simply as agent for the subscribers; that said agreement was made by plaintiff's assignors with the other syndicate subscribers to it and not with respondent at all, and that, therefore, it would not be rendered voidable even if respondent was guilty of fraud, he not being a party to it; that any relief must lie in an action in behalf of all the syndicate subscribers or their successors simply to rescind the purchase by defendant of his own property. In support of this argument the principle is cited, "If the party by whose representation a transaction has been induced, is not a party to the transaction, the transaction stands good and cannot be avoided, unless one of the parties to the transaction was implicated in the fraud." (Kerr on Fraud and Mistake

[3d ed.], p. 361. See, also, *Sim* v. *Edenborn,* 163 Fed. Rep. 655.)

I do not think that the principle invoked is applicable to the facts which may be found in this case.

It is, of course, true that in an action between two parties to a contract, one cannot avoid it as against the other who is entirely innocent, on the ground that he was induced to make it by the fraud of a third party wholly disconnected with the transaction. So far as I can find, however, this principle has never been applied in an action by the injured party against a person claiming protection as agent under a contract· which he had fraudulently induced. But beyond this I do not think that it can be said that the moneys of plaintiff's assignors were not paid to defendant under a contract for his benefit and to which he was a party. He was the promoter of the enterprise and procured the execution of the syndicate agreement. By its express terms it was made by each subscriber not only with the· other subscribers but also with him as a syndicate manager, and it was for his benefit not only in authorizing him to purchase the property in question but also in conferring upon him general powers as a manager. If the contract be regarded as a single one between each subscriber on one side and his fellow-subscribers and the managers on the other, it must follow that the fraud of either of the latter in inducing it would be a ground of rescinding it against all parties. If the agreement should be regarded as embracing two contracts, one made by each subscriber with his fellow-subscribers, and a second one made by him with defendant as agent and manager, it may be that in an action between the subscribers the contract could not be avoided because of the latter's fraud, although I have doubts about that.

In *Metropolitan.Coal Consumers Case* (66 Law Times ·[N. S.], 700) it was held, after consideration of the principle now being urged . by defendant, that a subscriber could be relieved from a subscription for corporation

shares because of false statements made by promoters in a prospectus issued before the corporation was organized, "although not made by the company or its agents."

But however this may be, this is an action between the subscriber and the agent, between whom in terms there existed a contract authorizing the transactions here involved, and in view of this and of the surrounding circumstances I do not think it possible for the latter to say that he was not a party to the contract and to the transactions which occurred under it within the rule now being discussed.

The claim that no moneys were paid to or received by the defendant under the contract thus made with him must be based on an interpretation of the legal effect of what was done rather than on the exact facts themselves, for there is no question that all of the subscriptions of plaintiff's assignors and other subscribers were paid to the defendant and his associate managers. I suppose the real meaning of this part of the argument is that because they received them as managers or agents under the agreement, the payment is to be regarded as having been made to the syndicate rather than to the managers. This argument, however, cannot be sustained. When the agreement under which the moneys were paid to the managers was rescinded it was destroyed *ab initio* and can no longer be utilized as an authority either for the payment by the agent to his principal or for the longer retention of the moneys by himself. (*Nash* v. *Minn. T. Ins. & Trust Co.*, 163 Mass. 574, 581. See, also, *Mack* v. *Latta*, 178 N. Y. 525, and cases cited.)

The only benefit which the defendant would secure from the agreement thus rescinded would be that before recovery of the moneys paid to him he should be restored to his original condition as against the acts which he had performed under the agreement before rescission. Even this general rule is not enforced with unvarying strictness and amongst the exceptions to it is the case where

the wrongdoer has so complicated matters as between him and the party seeking relief that complete restoration is impossible. (*Masson* v. *Bovet,* 1 Denio, 69; *Hammond* v. *Pennock,* 61 N. Y. 145.)

Therefore, defendant's claims bring us to the final question whether plaintiff's assignors did so properly and sufficiently offer to restore him to his original position as to entitle them to recover the moneys which had been paid to him.

It will be recalled in this connection that defendant and his associate managers transferred the property acquired with the syndicate subscriptions and any unexpended balance of said subscriptions to a reorganized corporation as permitted by the syndicate agreement and that for this property this reorganized corporation issued capital stock at par which was delivered to the defendant and his associates and by them distributed to the various subscribers in proportion to their subscriptions, and that plaintiff and his assignors tendered to defendant the stock so issued to them on demanding the return of the money.

If the only transaction involved had been the purchase of defendant's stock and this stock after purchase had been transferred to the corporation which had issued receipts or stock as against it to the various subscribers in proportion to their subscription and the assignors had tendered to defendant this stock on demand of their money, I think that there is no doubt but that this would have been a sufficient offer to restore defendant to his original position. This not only would seem to be so on principle but to be settled by authority.

In *Getty* v. *Devlin* (54 N. Y. 403) it appeared that plaintiffs had been induced by fraud to sign a subscription paper for the purchase of certain property owned by promoters of the scheme and subsequently they paid in their subscriptions which were received and divided by the associated schemers. A company was thereupon organ-

ized, the property transferred to it, stock being issued in payment therefor to the various subscribers. On discovery of the fraud the plaintiffs offered to return to the fraudulent promoters the stock which had thus been received by them and sought to be relieved from the fraud which had been perpetrated upon them. It appeared, however, that in the meantime the real estate which had been thus conveyed to the corporation had been sold on claims held by the plaintiffs themselves against the corporation. Their complaint was dismissed at the Trial Term and on the appeal to this court Judge EARL wrote as follows: " I am, therefore, clearly of the opinion that the plaintiffs were entitled to relief in some form. They could not, on account of the fraud, recover back all the money paid by them, because they could not restore the four defendants to the position they were in before the transfer of the real estate to the company. The real consideration for the money subscribed and paid was the real estate which was conveyed to the company at the request of the subscribers. The company took the title to the real estate, and then their interest in the company and through it in the real estate was represented by shares of stock. The plaintiffs did not place the four defendants in the position they were before the real estate was conveyed, by returning their stock, because what the defendants parted with was the real estate, and that had passed beyond their control. The plaintiffs caused it to be seized and sold for their debts against the company, after the discovery by them of the fraud of which they complain. It is a rule, quite uniform, that a party who seeks to recover back money which he has been induced to pay for property by fraud, must restore the property before he can rescind the contract of purchase and recover the money paid." (p. 414.)

By what was thus said I think it was fairly implied that if the corporation had still been in possession of the real estate which formed the subject of the fraudulent contract, plaintiffs, by tendering the stock which repre-

sented their interest in the real estate to the defendant, would have offered a sufficient restoration. .

In this case, however, defendant and his associates acquired not only his stock in the corporation but also various other property, and all of this was transferred to the corporation and represented by the new stock, of which plaintiff's assignors received and tendered back their share. It is urged that even assuming an illegal purchase of defendant's stock, plaintiff's assignors should not be allowed to tender him certificates which represented not only their interest in that stock but also in the other property transferred to the corporation, and compel him to refund their entire syndicate payments, and thus take up their interest in all of the property acquired; that such a proceeding would not only be inequitable in this case but that the principle might lead to almost absurd results where the property improperly purchased was smaller in proportion to the entire property acquired than here. I am not unprepared to admit that there may be some equity in this argument in this case, for it sometimes does occur that at the end of an unsuccessful enterprise those who have lost their money are not averse to transferring their losses to some one else because of alleged faults which as a matter of fact never exercised any substantial influence on the enterprise. I do not, however, see how this result can be avoided. The agreement authorizing the purchase and organization of various properties was an entire one. The conclusion has been reached that so far as it authorized the purchase of or related to defendant's property it was constructively fraudulent even though there was no actual fraudulent motive on his part. I see no way in which the agreement can be subdivided and a rescission allowed as to part and not as to the rest, and of course it follows that if the entire agreement is vitiated and rescinded the plaintiff's assignors are entitled to recover all that was paid under it on restoration of what they received.

I recommend that the judgment appealed from should be affirmed as to the appellant personally, and should be reversed and a new trial granted, with costs to abide event, as to the causes of action assigned to him by Daniels, Moen, Lott, Miller and Frank Baackes.

Judgment reversed and new trial granted, costs to abide event. All concur, except HISCOCK, J., who writes for reversal as to claims assigned to the plaintiff, but for affirmance as to his individual claim, with whom GRAY, J., concurs. All others concur in opinion of HISCOCK, J., except as to such individual claim.