GEORGE T. WILLIAMS, Appellant, *v.* ALBERT FREEMAN and Others, Respondents.

First Department, March 13, 1925.

**Sales — action based on fraud and misrepresentation to recover amount paid for corporate stock — evidence established absolute rescission of contract and tender back of stock to defendants with demand for repayment of consideration — evidence made out prima facie case of fraud and misrepresentation — error to dismiss complaint at close of plaintiff's case.**

It was error for the court to dismiss the complaint at the close of the plaintiff's case in this action based on fraud and misrepresentation to recover the consideration paid by the plaintiff to the defendants for worthless corporate stock, since the plaintiff proved that as soon as he discovered that the stock was worthless and that the representations inducing him to purchase were false and fraudulent, he tendered the stock to the defendants and demanded back the consideration which he paid therefor; and since a *prima facie* case of fraud and misrepresentation made for the purpose of inducing the plaintiff to purchase the stock, and on which he relied in making the purchase, was shown by evidence to the effect that the defendants represented the company, an oil-producing corporation, as being financially sound and as having paid large dividends and as then producing large quantities of crude oil, and being the owner of a valuable patent for the location of oil-bearing sand, all of which representations were shown to be false and fraudulent, and known to be such by the defendants at the time they were made.

The defendants' contention on the motion to dismiss the complaint that the action was one of rescission, cannot be sustained, since clearly the action is one at law to recover back the consideration after the plaintiff had absolutely rescinded the contract for fraud and tendered back the stock received.

APPEAL by the plaintiff, George T. Williams, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 25th day of June, 1924, upon the dismissal of the complaint by direction of the court at the close of the plaintiff's case.

*Jacob Gordon* of counsel, for the appellant.

*John M. Coleman* of counsel, for the respondents Albert Freeman and Mayfair Oil Company.

*Charles L. Lark* [*Ralph A. Gilchrist* of counsel], for the respondent Kenneth Cowan.

BURR, J.:

This action is brought to recover the sum of $20,000 which plaintiff paid in Liberty bonds for stock of the defendant Mayfair Oil Company and which sum he alleges he was induced to part with relying upon the false and fraudulent representations made to him by defendants Freeman, Cowan and Mayfair Oil Company as to the business, the assets, the income and the financial standing of the said company.

The plaintiff's attention was first brought to the stock of the company by an old friend from Alaska, one Ted Cowan, who called upon him and stated he was acting as agent for his brother, Kenneth Cowan, who had acquired, or was about to acquire, a block of 100,000 shares of the stock of the Mayfair Oil Company, and urged plaintiff to avail himself of an exceptional opportunity to acquire stock in this company on unusually favorable terms.

On October 6, 1919, Kenneth Cowan wrote plaintiff a letter marked " confidential," in which he said:

" The shares of an important Company are contemplated to be listed on the New York market shortly, and I expect to contract for a block of this stock on very advantageous terms.

" Our business as you know, has always been confined to the purchase and sale of Bonds and high grade Investment Securities, so that ' Oils ' are not in our line.  It was brought about entirely through a friend who is associated with that Company and I was able to learn about it, and just what is contemplated by the management.

" The very high standing of the men comprising its directorate, determined my course in the matter, and I feel most confident that this opportunity will prove very profitable, and I shall be pleased to advise you about it fully in a day or two or as soon as I have completed my arrangements."

Later on, in the month of October, Kenneth Cowan told the plaintiff that he had acquired the stock, that there were prominent people connected with the company, and that a Mr. Barnett, a friend of the plaintiff's, was interested in the purchase of the stock and in the company, and was about to become a director in the company.  Subsequently it developed Barnett was elected a director without his knowledge, and on learning of his election promptly repudiated it as unauthorized, and resigned.  Kenneth Cowan told plaintiff he considered it a very good stock and he was willing to let the plaintiff in on part of it at three dollars and fifty cents a share, the par value being five dollars.  He further stated at that time that they expected to put the stock on the Curb at twenty

dollars a share. On several occasions thereafter Kenneth Cowan talked with plaintiff and told him that his brother, Ted Cowan, was acting as his agent and that the company was doing well, that he had investigated it, that it was producing daily some 2,300 barrels of oil, and that they would all make lots of money.

The defendant Freeman, who was president of the Mayfair Oil Company, called on plaintiff several times thereafter in company with Ted Cowan in an endeavor to induce plaintiff to purchase the stock of the company. Freeman, in Ted Cowan's presence, told plaintiff and plaintiff's friend, Spielberg, that the company was a $3,000,000 company; that they had sold all the stock, excepting only the block Mr. Kenneth Cowan had that was unsold; that the company owned thousands of acres of oil land in Louisiana and Texas; that they had options on large acreage in Oklahoma; that they had been in production for a long time; that these were very profitable operations; that at that particular time they had a well production of 2,300 barrels per day and had a number of wells that were being drilled; that they were earning sufficient money to put them on a dividend basis, and they would soon consider dividends of somewhere in the neighborhood of twenty-five per cent, which would enable them to market the stock on the Curb. He further stated to plaintiff in the presence of Cowan and Spielberg that the company owned a patent " oil locator " and it had been proved that when this " oil locator " was put alongside of a well already in production it would show the depth it would be necessary to drill and it would show the amount of oil that they might expect from the flow; that they had proven it in cases where the well was already in production, and that they had full control of the " oil locator " for the Mayfair Oil Company; that the Mayfair Oil Company was going to be a big success; that they were selling oil right along, several hundred thousand barrels of oil; that they had earned up to date about $1,000,000; and that if plaintiff was not satisfied at any time with the purchase of the stock of the company, the company was in a position to reimburse him what he paid. He painted, says the plaintiff, " a very rosy or oily picture of the situation."

These negotiations, it appears, extended over a considerable period of time. Plaintiff at one time notified defendants he refused to have any part of the stock. He did not adhere to that determination, however. In 1920 negotiations were again resumed. Freeman had an interview with plaintiff in March, 1920, at which Freeman again discussed the matter of the purchase of the stock; and at that time the plaintiff told Freeman he did not have any cash available to put in, but that he had Liberty bonds. Freeman

said that so far as he was concerned he would be willing to take the Liberty bonds, but they would have to talk to Cowan about it. The next time the plaintiff saw Freeman was about two days later when Ted Cowan, Kenneth Cowan and Freeman all came down to the plaintiff's office, and at that interview Freeman reiterated what he had previously said with regard to the company, its business and its prospects. Kenneth Cowan told plaintiff that he, plaintiff, was getting in on a good proposition, that he, Cowan, had investigated it and was satisfied they would all make a lot of money out of it in a short time. Kenneth Cowan further said at that time that the company was doing very well; that they were in production — over 2,300 barrels daily at that time. And similar statements were made at the same time by Freeman. Freeman stated in the presence of all that they had drilled several wells; that they were in production; that they were making money and paying dividends, or were about to pay dividends.

As a result of this interview between the plaintiff, the Cowans and Freeman, the plaintiff paid $20,000 par value Liberty bonds, and received therefor 5,715 shares in the Mayfair Oil Company. The Liberty bonds were taken in hand by Ted Cowan. The stock delivered to plaintiff was in the name of Kenneth Cowan and indorsed in blank. Having received the Liberty bonds, Freeman, Ted Cowan and Kenneth Cowan again congratulated plaintiff on his good fortune and went away together.

As to the representations made by the Cowans and Freeman the plaintiff was corroborated by a witness, Harold Spielberg, who also invested in the stock at the same time with the plaintiff. Later on the plaintiff, not hearing anything with regard to the condition of the company, though he made many efforts to get in touch with the Cowans and with Freeman for that purpose, finally succeeded in getting an interview with Freeman. That gentleman expressed the keenest regret in being obliged to tell the plaintiff that unfortunately the company had not struck oil, but instead had struck " dusters," which is a term used to designate the fact that there was no oil in the fields, or to be more accurate, that there was no oil where the wells were sunk in the fields. The president stated that the whole proposition was a failure and was a very great disappointment to him personally. There was no cash. There were no dividends. They had no inventions, no royalties, nothing.

The plaintiff tendered back his stock to both Freeman and Cowan, and demanded from them the return of his $20,000 which he had paid them in Liberty bonds; but they refused to return any part of the $20,000. The president sadly informed him that

under the circumstances it was impossible. Nothing appears to have been left after the collapse of the company, except a proposed profitable use of the marvelous " oil locator," which the defendant Freeman with unabated hope told plaintiff he believed would be the means of restoring the shattered fortunes of the company; and for this purpose Freeman proposed to organize a syndicate to acquire from the inventor that infallible instrument known as the " Sutton Oil Locator," in which syndicate Freeman cordially and unselfishly invited the plaintiff to participate.

On August 26, 1920, Freeman wrote the plaintiff:

" I do not speak of this, however, with an attempt to entice you in the Syndicate. After your experience with Mayfair, and the frame of mind I found you in concerning it, I would have been loath to speak of the Sutton matter to you, no matter how attractive or important it may appear from my standpoint.

" You know very well I spoke to you about it only because I had it in mind when you called in the other day, and I gave you the facts merely because you asked for them. And yet, if you should want to take a gamble in what would seem one of the biggest things in anyone's business experience, I would be pleased to have you come in with us."

On September 2, 1920, Freeman again wrote the plaintiff:

" I am just in receipt of your letter of the 1st instant, and note that you have decided not to participate in the Syndicate.

" I hope you will absolve me from any desire to press this matter on you and that it was, so to speak, accidental that I mentioned it to you.

" When you say that Professor Sutton's discovery was not sufficiently tested out, I fully agree with you, for if it had been, and if we would possess proof today that it is an infallible instrument, a 1% interest in the Syndicate would be easily worth a $1,000,000 at this moment.

" I have regarded the project, however, purely as a gamble and the tests we have conducted prove so convincing that I felt that I could afford to take that gamble and notwithstanding what you say I still maintain that where a 1% interest is to cost $2,000, with a possibility that it may be worth $1,000,000, that such a gamble is worth while taking."

The credulity of the plaintiff appears to have been overtaxed, and his confidence in the company and in the defendants was in consequence completely shattered; he threw away the proffered opportunity to make $1,000,000 for the small investment of $2,000; he declined to participate in the proposed syndicate, and thereafter began the present suit. Plaintiff in his complaint alleges that the

representations made to him by defendants, setting them forth specifically and in detail, were false and untrue, were known by defendants to be false and untrue, and were made by defendants with intent to cheat and defraud him and to induce him to purchase the stock of the company and to pay $20,000 therefor; that he made such payment relying upon said representations; that he, upon finding such representations to be false and untrue, tendered back the stock and demanded from defendants the return of his $20,000 which he had paid in Liberty bonds, which demand was refused. Plaintiff alleges that by reason of the foregoing facts he has been damaged in the sum of $20,000, and asks judgment for the recovery of the said sum.

The defendants, Freeman and the Mayfair Oil Company, each separately answering the complaint by the same attorney, deny making the representations claimed by plaintiff to have been made, deny the allegation as to the falsity of such representations " except that the stock of the defendant corporation was not paid for in cash, and that the defendant corporation did not earn one million dollars as profits from the time of its inception, and that dividends were not declared in the neighborhood of 20% to 25%, and that no dividends had been declared since the plaintiff became a stockholder, and that the defendant corporation did not own the rights to certain valuable inventions," and " except that this defendant was an officer and director of the defendant corporation."

Defendant Cowan, in his answer, denies making the representations alleged, denies the falsity of such representations " except that said defendant denies that he has knowledge or information sufficient to form a belief as to the truth of the allegations * * * to the effect that the defendant Mayfair Oil Company had not received or accepted subscriptions for 600,000 shares of its stock; that the said Mayfair Oil Company had at no time sold said 600,000 shares of its capital stock or obtained subscriptions therefor; that a large portion of its stock still remains unissued; that a large portion of the stock which had been issued had not been paid for at the par value thereof; that the said company did not have valuable accounts and bills receivable in large amounts; that said corporation did not earn one million dollars as profits from the time of its inception; that the market price of the stock of the said Mayfair Oil Company is not far greater than the par value; that the defendant corporation did not own rights to certain valuable inventions and machinery; and that said corporation did not have sufficient moneys on hand to discharge shareholders who desired to surrender their stock to said defendant corporation at any time.

21

Defendant admits that said defendant corporation did not declare dividends in the neighborhood of twenty to twenty-five per cent, nor any dividend since the plaintiff became a stockholder."

Said defendant further denies that he was an officer or director in said Mayfair Oil Company.

The defendants moved for a dismissal of the complaint at the end of the plaintiff's case on the ground of failure of proof and that the action was in rescission. The court granted the motion to dismiss without stating any ground therefor.

The testimony of the plaintiff and his witness as to the representations and the admissions of the defendants made out a *prima facie* case. The sole question to be determined was whether defendants had made the misrepresentations alleged. The action was not an action in equity for rescission, but an action at law for recovery of the amount of the consideration parted with and which plaintiff had paid for worthless stock. Plaintiff rescinded the contract absolutely and sued in an action at law to recover the consideration parted with. He did what was required to maintain such action. He tendered back the stock to the defendants and demanded back the consideration which he had paid therefor.

In *Vail* v. *Reynolds* (118 N. Y. 297) the court said that in an action for false representations the purchaser, upon discovery of the fraud, has three remedies open to him, any one of which he may elect: He may rescind the contract absolutely and sue in an action at law to recover the consideration parted with, and to maintain such action he must first offer to restore to the other party whatever may have been received by virtue of the contract. He may bring an action in equity to rescind the contract and in that action have full relief. He may retain what he has received and bring an action at law to recover the damages sustained. (See, also, *Heckscher* v. *Edenborn*, 203 N. Y. 210; *Haessig* v. *Gregory*, 197 App. Div. 111; *Wood* v. *Dudley*, 188 id. 136; *Turner Lumber Co.* v. *Lacey*, 199 id. 534, 536.)

I think the language of the court in *Churchill* v. *St. George Development Company* (174 App. Div. 1) which was also an action based on fraudulent representations, is quite applicable to the situation here. In that case the court in reversing the judgment below dismissing the complaint, said (p. 2): " The character of the action is to be determined from the complaint. Examination of this pleading discloses that it contains every element essential in an action in fraud to recover the damages sustained thereby. It also embodies allegations of an attempted rescission preceding the action and the refusal of the defendants to rescind. Its prayer for relief is not for rescission, but is for damages alleged to have

been occasioned, in the sum of $1,332.31. True, this amount is the amount paid for the stock plus certain expenses incurred in an investigation following the purchase. That coincidence, however, does not necessarily determine the character of the action. Inasmuch as the complaint contains all the essential allegations of an action in fraud for the damages sustained thereby, we are at liberty to construe same as being that form of action, and to admeasure the rights of the parties with such construction in view. In reaching an equitable result between these parties we are at liberty to disregard the allegations respecting rescission and treat them as mere surplusage. (*Novotny* v. *Kosloff*, 214 N. Y. 12.)

" So regarded, there is no difference in the status of the defendants. The development company as principal, the other two defendants as agents, or *vice versa*, are all equally liable for false and fraudulent representations made, resulting in damage to plaintiff. This is true, irrespective of which of them profited by the transaction. (*Laska* v. *Harris*, 215 N. Y. 554.)   *   *   *."

And further (at p. 6) the court said: " It is not clear from this record which of the defendants received the proceeds of this sale. That is not, however, necessarily a material inquiry. Each defendant who participated in the fraud, to the detriment of the plaintiff, is equally liable, whether he shared in the profits of the transaction or not. (*Laska* v. *Harris*, *supra*.) If it should develop in the course of the new trial to be ordered that the corporation received the profits of this sale, then such corporation is also responsible for the oral declarations made by its officers to induce the sale. A principal who accepts the benefits of a transaction negotiated by his agent adopts with such benefits the means taken to procure them. Even though innocent of intentional wrong, the principal may not retain such benefits and repudiate the fraud which gave rise to them. (*Green* v. *des Garets*, 210 N. Y. 79; *Taylor* v. *Commercial Bank*, 174 id. 181, 188.)

" Neither may any defendant escape responsibility through plea of lack of personal knowledge of the truth of declarations made by him. The makers of these representations, whether by prospectus or orally, either knew or did not know the actual facts with reference to this tract of land. If they did know and misrepresented, then they are clearly liable for such fraud. If they did not know its condition, then they knew of such lack of knowledge on their own part. Then their statement made as if from personal knowledge is equally fraudulent as though intentionally falsely made. If damage ensues from either of these two situations the person making representations must be held to responsibility. (*Rothschild*

v. *Mack*, 115 N. Y. 1; *Kountze* v. *Kennedy*, 147 id. 124; *Hadcock*
v. *Osmer*, 153 id. 604.) "

The evidence produced by plaintiff in the instant case would
seem to present *prima facie* evidence of false and fraudulent repre-
sentations and to sustain the cause of action alleged against the
defendants.

As was said in *First National Bank* v. *Miller* (163 N. Y. 164,
167): " Fraud is one of the broadest issues known to the law, for it
can seldom be proved by direct evidence, but is dependent upon cir-
cumstances which, separately considered, may be quite immaterial,
but when combined are not only material but have great persuasive
force."

I am of the opinion that the dismissal of the complaint by the
learned trial justice was error, and that the judgment appealed
from should be reversed and a new trial granted, with costs to
the appellant to abide the event.

CLARKE, P. J., DOWLING, MERRELL and McAVOY, JJ., concur.

Judgment reversed and new trial ordered, with costs to appellant
to abide the event.