GREGG et al. v. MEGARGEL.

(District Court, S. D. New York. October 28, 1918.)

1. JOINT ADVENTURES ⬮5(2)—ACTIONS—EVIDENCE.
   In suit by members of a syndicate against defendant, who organized the same and transferred to the syndicate certain corporate stock, evidence *held* to show that defendant did not intend, by means of a letter to those invited to become members of the syndicate, to deceive as to the price he paid for the stock.

2. JOINT ADVENTURES ⬮4(1)—MUTUAL RIGHTS AND LIABILITIES—DECEIT—WRITTEN INSTRUMENTS.
   Where defendant, who organized a syndicate, issued a letter inviting persons to join, ambiguities in the letter must be resolved against defendant, where it was asserted that he was guilty of fraud in misrepresenting to members of the syndicate the price he paid for the corporate stock delivered to the syndicate.

3. JOINT ADVENTURES ⬮4(1)—RELIANCE ON FRAUDULENT STATEMENT.
   Where persons who entered a syndicate formed by defendant knew at the time they joined the facts concerning defendant's purchase of stock which he transferred to the syndicate, they cannot recover on the theory that defendant, in letters inviting them to join the syndicate, misrepresented the price he paid for the stock.

4. JOINT ADVENTURES ⬮4(1)—RELIANCE ON FRAUDULENT STATEMENT.
   Where persons who joined the syndicate formed by defendant did not rely on his representations as to the price at which he acquired corporate stock which he delivered to the syndicate, they cannot recover for misrepresentations as to the matter.

5. JOINT ADVENTURES ⬮4(1)—MUTUAL RIGHTS AND LIABILITIES.
   Where defendant, who organized a syndicate to take over corporate stock, which he had already acquired, in conversations with one H., who became a member, induced H. to believe that defendant had paid for the stock the price received from the syndicate, *held*, that others who were induced by H. to join the syndicate could not rely on the misrepresentations made to H.

---

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. JOINT ADVENTURES ⬦5(2)—ACTIONS—BURDEN OF PROOF.**

In an action for fraud upon members of a syndicate formed by defendant, *held*, that persons joining the syndicate had the burden of proving the fraudulent misrepresentations of defendant.

**7. JOINT ADVENTURES ⬦4(1)—MUTUAL RIGHTS AND LIABILITIES.**

Where one who had joined the first syndicate organized by defendant, who transferred to the syndicate at $7 a share stock which he had bought for half that sum, learned of the true facts, *held*, that such person, having, without objection, joined a second syndicate organized to take over the stock, cannot recover, for that amounted to an affirmance of the first contract.

**8. PRINCIPAL AND AGENT ⬦111(1)—AUTHORITY OF AGENT—SUBSCRIPTION TO SYNDICATE.**

An agency to subscribe to a syndicate organized to take over corporate stock does not continue, per se, as an agency to waive, relinquish, or condone misrepresentations made by the organizer of the syndicate.

**9. JOINT ADVENTURES ⬦5(2)—ACTIONS—EVIDENCE.**

In a suit against defendant, the organizer of a syndicate, where it was contended defendant misrepresented the price at which he acquired stock delivered to the syndicate, and the written contract, embraced in letters to persons invited to join the syndicate, was ambiguous, *held*, that evidence as to defendant's conversations was admissible, as showing the construction plaintiffs were led to place upon the writing.

**10. JOINT ADVENTURES ⬦4(1)—MUTUAL RIGHTS.**

Where defendant organized a syndicate to take over corporate stock, which he had already acquired, persons who joined the syndicate, relying on representations that the stock was turned over to the syndicate at the price defendant paid, may, without repudiating the whole agreement, require defendant to deliver them shares in the syndicate on the basis of the price he paid for the stock, but they cannot require defendant to account for the entire profits resulting from the transaction.

**11. JOINT ADVENTURES ⬦5(1)—ACTION FOR ACCOUNTING.**

Where it did not appear that defendant, who organized a syndicate, had refused to fully and properly account, though there was a controversy as to whether he misrepresented to members the price which he paid for corporate stock delivered to the syndicate, *held* that, in a suit seeking relief on that basis, defendant should not be required to account as to the transactions of the syndicate.

In Equity. Suit by Nathan Gregg, Charles B. Whitehead, and George O. Wolf, copartners doing business under the firm name of Gregg, Whitehead & Co., and others, against Roy C. Megargel, doing business under the firm name and style of R. C. Megargel & Co. Bill dismissed as to some of plaintiffs, and as to others part only of the relief granted.

See, also, 248 Fed. 960.

White & Case, of New York City (George O. Redington and Vermont Hatch, both of New York City, of counsel), for plaintiffs Gregg and others.

George L. Ingraham, of New York City, for plaintiffs Gates and Eccles.

Wollman & Wollman, of New York City (Henry Wollman, of New York City, Clarence Alexander, of Yonkers, N. Y., and Herbert Haase, of Chicago, Ill., of counsel), for intervening plaintiffs.

Powell, Wynne, Lowrie & Ruch, of New York City (Herbert C. Smyth and Frederick J. Powell, both of New York City, of counsel), for defendant.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MAYER, District Judge. Though in form one lawsuit, the trial really involved the consideration of a series of cases, because of the fact that the various plaintiffs and interveners entered into transactions with defendants under varying circumstances, and each case, to the extent not governed by certain propositions common to all, must be disposed of on its own facts.

The complaint of plaintiffs, so far as it relates to Gregg, will serve to typify the theory of plaintiffs. Gregg alleges that in August, 1917, Megargel made a proposition, contained in a letter dated August 17, 1917, which was accepted by Gregg and the other plaintiffs, and "thereupon constituted a separate agreement on the part of each of the plaintiffs with the defendant; that said letter * * * constitutes the entire agreement between the parties," except, of course, the number of shares of stock subscribed for by each plaintiff; that Gregg et al. subscribed in certain amounts, and paid certain amounts on account of their stock subscriptions; and—

"Seventh. That the said agreements were obtained from the plaintiffs by the defendant through fraud and misrepresentation, in that both by the wording of the agreements and by statements made to the plaintiffs by the defendant, with the intent to deceive and defraud the plaintiffs, and to induce them to enter into the agreements, the defendant represented that he had paid, or was to pay, $7 per share for all of the 100,000 shares of stock embraced within the agreements; whereas, on information and belief, the plaintiffs allege that at the time of making such representations the defendant, unknown to the plaintiffs, had an option for, or already had acquired, the said stock at a price of $3.50 per share.

"Eighth. That plaintiffs relied upon the said representations made by the defendant and were induced thereby to enter into the said agreements.

"Ninth. That the defendant, in acquiring said stock at $3.50 per share, was acting as the agent or representative of the plaintiffs and each of them.

"Tenth. That the plaintiffs have tendered and do now tender to the defendant payment for their nonwithdrawn stock on the basis of $3.50 per share, in addition to such reasonable commission and brokerages for sales or purchases effected by the defendant, and all necessary expenses incurred by the defendant in the acquisition and marketing of the syndicate stock, and other necessary expenses incurred by him as syndicate manager; and plaintiffs have demanded and do now demand of the defendant the delivery to the respective plaintiffs of the number of shares of nonwithdrawn stock of their subscription, but that the defendant has refused and still refuses to accept said payment as payment in full and to deliver said nonwithdrawn stock to the plaintiffs." ·

The complaint then refers to transactions of the syndicate as such and after its formation. Relief is asked for as follows:

"(1) That the defendant render to the plaintiffs a true and full account setting forth the following items and particulars:

"(a) The amount defendant paid per share for the 100,000 shares of syndicate stock, referred to in Exhibit A, together with the date or dates when defendant acquired said stock.

"(b) An itemized account of the purchases and sales of the syndicate stock. * * *

"(c) An itemized expense account of the disbursements. * * *

"(d) The amount of cash received from participants on account of the 80,670 shares of nonwithdrawn participation stock, and the amount receivable.

"(e) An itemized account of all other receipts and expenditures of the said syndicate.

"(2) That pending a full * * * accounting the defendant be enjoined from disposing of * * * any of the stock of the syndicate which the plain-

tiffs claim, and that defendant be enjoined from disposing of any of the property, money, interests or effects of the syndicate.

"(3) That a receiver of the syndicate stock, money, and property * * * be appointed, with the usual powers and duties.

"And plaintiffs demand final judgment against the defendant as follows:

"(4) That upon payment to the defendant by each or any of the plaintiffs of the balance due on their subscriptions for nonwithdrawn stock, at the rate of $3.50 per share, plus their pro rata share of the commissions and expenses, referred to in paragraph or subdivision 10 of this bill of complaint, the defendant be required to deliver forthwith to each of the plaintiffs making such payment, the entire number of shares of their subscriptions for said nonwithdrawn stock. * * *

"(7) That the plaintiffs have such other and further relief in the premises as may be just and proper."

Defendants deny liability, and counterclaim for the difference between $7 per share and the amount paid by respective plaintiffs on their subscriptions to which plaintiffs interpose their reply in accordance with New York Code practice, denying liability for the difference so claimed by defendants.

It will be noted at the outset that plaintiffs have not brought an action at law to recover damages for fraud or deceit, nor do they seek in equity for a rescission and the return of their money. They proceed on the theory that Megargel was their agent in purchasing the stock, and as such must account for the difference between $3.50, the price he paid for the stock, and any amount over $3.50 which he may have received from any of the persons who became members of the syndicate. To put the matter in their own way, plaintiffs affirm the contract and seek to compel one who they assert was their agent fiduciary to account for all his profits. Defendant insists that he was not acting as an agent to purchase, but was a vendor to the respective individuals who became syndicate members, and as such was not under any obligation to disclose the price at which he was buying the stock.

Plaintiffs may be divided preliminarily into two general classes: (1) Those who relied on the letter alone; and (2) those who also relied on oral representations or statements by defendant or others—the legal effect of which will be discussed later. The syndicate letter is annexed,[1] the paragraphs being numbered for convenient reference.

[1-4] It is but just to defendant to state that I am satisfied, on the evidence, that there was no intent to deceive by means of the letter. The letter was prepared by attorneys of unquestioned integrity, and, if there was ambiguity, it was not deliberate, but was due to the elusive character of language. Megargel and his lawyers undoubtedly supposed that they had made clear that he was a vendor to the syndicate, selling the stock for $7, without any representation as to what he paid or was to pay for it, and from that point of view it was nobody's business what he paid or was obligated to pay for it. There is no doubt that Megargel did not disclose, nor intend to disclose, the price he was paying. Such a course, he may have thought, might interfere with the sale, because it sometimes happens—at least in certain kinds of syn-

---

[1] See note at end of case.

dicate transactions—that possible subscribers hold off if they think the vendor is making too much of a profit.

But the failure to disclose does not import fraud nor misrepresentation, if the relation is one of vendor and vendee at arm's length. Another fact which indicates the lack of intentional fraud is that the letter was not distributed broadcast to the public, but was sent to a limited clientele. Indeed, all the plaintiffs knew their way about, and most, if not all, of them, for one reason or another, sought to be permitted to subscribe.

But, whatever may be the purpose or the mental conception of the writer of a letter, he is held to the language employed, as that language may impress the reader of ordinary intelligence. The test is not the intent of the writer but the meaning to the reader. When, therefore, such a writing as this syndicate letter invites money subscriptions, the writer must make his meaning clear, and any ambiguity must be resolved against the author.

Counsel for both sides have elaborately analyzed the letter, but the true approach is to obtain the impression created by the first reading of the letter. A fine analysis, word by word, is often responsible for a wrong conclusion. Much has been said (a) to the effect that Megargel clearly represents himself as an agent and (b) per contra that he clearly represents himself as a vendor. The fact is that there is great difficulty in determining the true construction. The letter deals with two propositions: (1) The forming of a syndicate by buying from Megargel; and (2) the conduct of the syndicate after formation. The important paragraphs to be considered are Nos. 2, 4, 6, and 9.

The impression created upon the mind of the reader, colloquially put, might readily be as follows:

"We are negotiating for the purchase of some Glenrock stock, which we have not obtained as yet, and we are forming a syndicate to take from us, out of this stock not yet obtained, an amount not to exceed 100,000 shares, if we succeed in getting the stock, as we expect, for $7 a share. (Par. 2.) In that event, you can come into a syndicate participation at $7 per share. (Par. 9.) We will not charge the syndicate for acting as syndicate managers other than reasonable commissions and the usual brokerages, because, so 1ar as the purchases of the stock for the syndicate are concerned, we' have been otherwise (satisfactorily) compensated, or, in other words, so far as these 100,000 shares are concerned, we have received pay for services rendered. We are to be managers of the syndicate, notwithstanding we are vendors thereto; i. e., notwithstanding that we are acting as the conduit through which the stock goes at $7 per share from its present owner to the subscriber via us."

Of course, a different construction might follow if paragraph 2 were construed so as to give emphasis to the comma after the word "us" and before the word "at," or if the phrase "at a price of $7 per share" had been differently placed, and other changes had been made, so as to read, for instance:

"To acquire from us at a price of $7 per share a portion of said stock to the extent of not exceeding 100,000 shares when, as and if said shares are acquired by us."

Then, again, in paragraph 6, if, instead of "compensated" ("to make suitable return to or for, as for services, loss, etc.; * * * remuner-

ate; as, to compensate one for his services; to compensate one's services"—Standard Dictionary), some language had been used to indicate a profit, as, for instance:

"We shall make no charge in view of our profit in our purchases and sales of said stock."

But, whatever may have been litigation-proof language, the result is that the letter is so worded that an intelligent man might well conclude that Megargel was negotiating to buy Glenrock stock at $7 per share, 100,000 shares of which he would put into the syndicate at $7 per share, and take his compensation, so far as the subscribers were concerned, out of the usual commissions and brokerages accorded to a syndicate manager, which, in an active syndicate, might result in a tidy sum. In point of fact, at that time Megargel, by virtue of an agreement with one Collins, dated August 10, 1917 (Exhibit 5), had contracted to buy 100,000 shares at $3.50 per, and that contract was carried out, so that the 100,000 shares of stock stood Megargel $3.50 per share.

Whatever may be the result of the representations made in the circular or (in addition) to some of the plaintiffs orally, there can be no recovery if, prior to subscribing, a plaintiff knew the fact that Megargel was paying $3.50; nor can there be recovery, unless a plaintiff relied upon the representations made. Certainly, if a plaintiff did not read the syndicate letter, or subscribed on representations made, without authority, by others than defendant or his agents, and the syndicate letter was a matter of indifference to such subscriber, it cannot be said that the letter or defendant's oral representations were an inducing cause; and, as alleged, in effect, in paragraph second of the complaint, each acceptance constituted a separate agreement individual to the particular plaintiff. There is no reason why the rule in this regard should be any different from rescission. The effect of going into the syndicate dehors the representations in the letter is that the subscriber did not care what the defendant made, and thus subscribed to the syndicate solely because he was satisfied to pay the price for what he considered a good investment.

In reviewing this branch of the case, it is impracticable to set forth at length an analysis of the testimony as it was developed, either by deposition or by witnesses orally on the stand. The depositions are voluminous and considerably interspersed with what seem to me to be irrelevant inquiries. The conclusions arrived at in some instances, and the impressions created by the witnesses, will be briefly (and, in a sense, summarily) stated.

Plaintiffs urged that one Taylor, who had full knowledge of the facts, was defendant's agent, and defendant, likewise, sought to characterize Taylor as the agent of some of the plaintiffs, but the testimony does not bear out either contention. What may be called the Taylor group subscribed largely on Taylor's representations, and, in one form or another, paid no attention to the syndicate letter. In this group are Bingenheimer, Clarkson, and Lathrop, and the bill is dismissed in favor of defendant as against these plaintiffs.

Manbeck went in because Hagens principally, and Sullivan also, thought the syndicate was a good thing. He did not remember whether

he received, or where he saw, the syndicate letter, but remembered seeing it, although he could not say that he took a good look at it. The bill is dismissed as against him.

Dailey undoubtedly relied on what one Kelly told him. In his case we have the extraordinary fact that, until his deposition was taken in this suit, he did not know that Megargel had paid $3.50 a share for the stock, and was surprised to find that the lawsuit, started in his behalf, contained such an allegation, and an allegation that he knew this fact. The bill is dismissed as to him.

Green (to whom the syndicate letter was shown by Kelly, and not sent by Megargel) merely read the letter in a "casual way," and really went in on "the information I could get from men that I thought knew more about it than I did"—i. e., Taylor, Wall and Kelly. The bill is dismissed as to him.

[5] As to E. A. Howard, I am satisfied that Megargel's conversations with him led him fairly to infer that he was buying the stock at $7 per share. I think that Megargel did not so state in so many words, but in his desire not to disclose that he was making a profit on the sale to the syndicate—and particularly in view of the conversation about the financing of the Norbeck and Nicholson property—he left Howard in a position to conclude that Megargel was selling the stock at the price it cost him, and thus to rely upon that interpretation of the syndicate letter, even though Howard may not have read the letter very carefully. The stipulation as to E. P. Howard's testimony is not impressive.

The E. A. Howard Group.—All of these men came in on the recommendation of E. A. Howard. Howard was not Megargel's agent, and his representations cannot bind Megargel, even though Howard, especially because of talk with Megargel, was justified in construing the syndicate letter as he did. The point is that the Howard group went in for reasons other than their reliance on the syndicate letter. The talk of Megargel with Howard cannot reach from Howard to the men who subscribed, relying on Howard's statements or judgment. The result seems anomalous, but it is the necessary consequence of the proposition that a plaintiff in this suit cannot have any recovery unless it is clear that he relied upon the representations of defendant.

Spratlen read the syndicate letter, but did not study it very carefully, and came in because, inter alia, he had been told by Howard that Megargel was to acquire the stock at $7 and "we would be on the same basis that he acquired it." Benedict never read the syndicate letter. Byram "left the whole thing to Col. Howard," and did not "know that I ever did learn" the price Megargel paid, and "did not understand much about the whole transaction."

• Newton had determined to go in before he received the syndicate letter. In this group the only close case is that of Burnham; but he relied "a good deal on Mr. Howard's judgment in matters of that kind," and, in all the circumstances, I am satisfied he did not rely on any alleged false representations in the letter. The bill as to all this group is dismissed.

Lamson Bros. & Co. went in entirely on the faith of defendant's telegram of August 15th, and not on the faith of the letter. The telegram of August 15th is clear, and is lacking either in ambiguity or misrepresentation. The bill is dismissed as to them.

The situation as to Nicholson is very much like that of E. A. Howard. There is considerable dispute as to the details of the conversations between Nicholson and Megargel (see testimony of Nicholson, Megargel, Ruch, and E. A. Howard), but enough was said to justify Nicholson in concluding that the ambiguous letter represented Megargel as buying, as well as selling, the stock for $7.

[6] Haase is an attorney, practicing in Chicago. He had been called in early in the matter, to wit, on August 8, 1917, in connection with the acquisition of certain properties known as the Norbeck and Nicholson properties, the details of which it is unnecessary to recite. Suffice it to say that on August 8, 1917, Haase left Chicago for Denver, and, after certain conferences, started back for Chicago on the night of August 10, meeting Megargel, Ruch, his attorney, and one E. A. Howard (the man who had brought the Glenrock proposition to Megargel's attention) on the train. As the result of a suggestion of Howard, Megargel stated that he was agreeable to letting Haase into the syndicate. Megargel showed Haase a typewritten draft of the proposed syndicate letter, which Haase read over carefully. There is a conflict in the testimony of Haase and Megargel as to whether at this time Haase made certain important observations. I do not doubt, for a moment, the good faith of Haase in placing the date of this vital conversation in which these observations were made at a time subsequent to the train trip on August 10; but the memory of the most scrupulous men is not always reliable, and I am satisfied that Haase is in error in denying, and Megargel is right in insisting, that the conversation took place on the train on August 10. The surrounding circumstances bear out Megargel. Haase is an experienced lawyer. He read the letter carefully, and an experienced lawyer might well, thereupon, say, as Haase did, that the paper was weak, because it made Megargel act in several capacities. A great deal of testimony (direct and cross) was taken on the point, but it comes down to this: That Haase must have understood that Megargel made clear that he was a vendor. That he so did seems clear, and the only real question is whether it was on the train on August 10, or later in the fall. In any event, whether, in point of fact, Haase or Megargel is right as to dates, the burden of proof is on Haase. Where, as here, the best that can be said is that the testimony on the question of dates is evenly balanced, the plaintiff, under fundamental rules, must fail. In such circumstances, the bill must be dismissed as against Haase.

Hubert E. Howard clearly relied on the representations of the syndicate letter, and, on the evidence, Haase was not H. E. Howard's agent, in the sense that Haase's knowledge, if any, bound him.

As to Wyland, there is no evidence to contradict his reliance on the syndicate letter. The fact that he came in through Taylor, and joined with Pelton and others in a circular letter, does not impute knowledge

to him. It is also clear that Parker and Brooks relied solely on the letter.

I was very favorably impressed with Gregg, and, while Megargel may not have used all of the expressions assigned to him by Gregg, I am satisfied that Gregg was justified by his talk with Megargel in concluding that the buying and selling price was $7, and in so construing the letter. Whitehead's testimony satisfactorily corroborates Gregg. Cranmer similarly impressed me, and I think is in the same position in this respect as Gregg.

Gates was concededly the agent of Eccles, and the position of one is that of the other. A careful analysis of the testimony of Gates will show that there were no misleading oral misrepresentations by Megargel. If there is any doubt, I accept Megargel's testimony as the more impressive. Gates, however (and therefore Eccles), had the right to rely on the syndicate letter representations, as also did Keeler Bros., for whom at this juncture Gates was likewise acting as agent.

To me, one of the most puzzling cases is that of Kelly, rendered additionally difficult because his testimony was taken by deposition. I disregard the oral representations alleged to have been made by Megargel, but I see nothing to controvert the fact that he relied on the syndicate letter.

From the foregoing, it will be seen that up to this point, Wyland, Parker, Brooks, Kelly, Gregg, Whitehead & Co., Keeler Bros., Wilson, Cranmer & Co., Nicholson, E. A. Howard, and Hubert E. Howard, Gates, and Eccles, are entitled to such relief as the law may accord.

[7] An additional question arises in the case of Keeler Bros., and still another question in the cases of Kelly, Gates, and Eccles. After Gates had learned that Megargel had paid only $3.50 for the stock, he signed an acceptance of the syndicate letter of November 1, 1917, for 3,000 shares, and an acceptance of the syndicate letter of November 14, 1917. He had read the letter of November 1, 1917, in Casper, and noticed that it was substantially similar to the letter of August 17. Before signing an acceptance of the second syndicate letter, he related to his attorney, Mr. Ridgley, in Cheyenne, all the matters that he knew or had heard about the Glenrock affair. He also helped to get proposed subscribers to the second syndicate. In reply to the second call, he wrote to Megargel, under date of December 4, stating, among other things:

"I realize, however, that you have been up against a hard game, and profit of any amount cannot be expected from the syndicate at this time. * * * It seems to me that from a standpoint of fairness and equity that you should not insist on your $3.50 per share profit out of the syndicate under the circumstances. In other words, if the stock goes to the syndicate members at a substantial reduction below the $7 mark, they will feel that, while they have something which they cannot sell, yet their investment will be of some substantial merit."

Numerous cases are cited by counsel as to the effect of waiver, and on the proposition that, in effect, no ratification can be had when a principal, who discovers a fraud, accepts the contract and affirms, instead of disaffirms. But it seems to me that equity requires, in such

case, the same rule as is applied at law, and as is thus stated in 14 Am. & Eng. Enc. 171:

"The rule that affirmance of a contract with knowledge of fraud does not bar an action for damages is subject to the limitations that the party defrauded must stand towards the other party at arm's length, must comply with the terms of the contract on his part, must not ask favors of the other party, or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagement respecting it. If he does so, he waives the fraud."

The law does not favor speculating on results. If Gates had refused to do more than pay $3.50, he might have been met by the insistence of Megargel that he was out of the syndicate, and if Megargel had been right in that stand, if the syndicate had been successful, Gates ran the risk of losing his $3.50 as well as his profits from the syndicate operation. But Gates was taking no chances on a quarrel or a lawsuit, and signed up for the second syndicate, which is but another way of stating that he condoned what he now claims was a fraud. Brown v. Lead, etc., Co., 231 Mo. 166, 132 S. W. 693, 140 Am. St. Rep. 509; Kingman & Co. v. Stoddard et al., 85 Fed. 740, 29 C. C. A. 413; Simon v. Goodyear Metallic Rubber Shoe Co., 105 Fed. 573, 44 C. C. A. 612, 52 L. R. A. 745. The fact that the second syndicate was not consummated is immaterial. It is the act of Gates which counts. For these reasons, the bill must be dismissed as against Gates and Eccles.

The bill must also be dismissed as against Kelly. The fact that Kelly had not paid $3.50 in all is immaterial. He ran the same risk for what he put in as did Gates. The same result would follow in the case of Keeler Bros., if Gates was their agent when he signed an acceptance of the second syndicate letter of November 14. The bill would also be dismissed on this ground as against Haase, in addition to the ground heretofore stated.

[8] As to Keeler Bros., it appears from the evidence that Gates was not, at the time of what defendant calls the "ratification," the agent of Keeler Bros. as matter of fact; nor, on the facts, was there any agency by estoppel. An agency to subscribe does not continue per se as an agency to waive, relinquish, or condone.

[9, 10] Before concluding this part of the case, it may be well to state that the theory upon which antecedent conversations as to representations were received is that, where false representations are alleged and the written contract is ambiguous,' the conversations are admissible as showing the construction of the writing which defendant's oral statements led plaintiffs to place upon it. If plaintiffs had sued at law or in equity for a rescission, there would be no difficulty in according appropriate relief. It is rare that a plaintiff affirms the contract, because, ordinarily, the plaintiff is only too glad to get his money back and to be restored to his original position. In this case, however, it is perfectly plain that, while many of the plaintiffs, in view of the vagaries of the market, saw very little profit, if any, out of the syndicate itself, they did see a possible very comfortable share of the profits which Megargel made in selling the stock to the syndicate. Therefore plaintiffs proceed on the theory which, in effect, is that the syndicate started

at once with the purchase of the stock by Megargel in accordance with his option, and thus it is that, when the question of remedy is considered, plaintiffs seem to think that "affirming" the contract means that defendant must account for the profit he made in the separate transactions whereby he sold shares of stock to various persons at presumably $3.50 gross profit per share. That defendant must account for the operations of the syndicate, as such, and that in such respect he was the agent of each and every subscriber, nobody disputes.

That he was the agent of those who became subscribers, to purchase 100,000 shares for their joint benefit, is negatived both by the syndicate letter and the conduct of the parties. The furthest his agency went in this regard was to purchase a definite number of shares for the particular person subscribing for those shares, and, when so purchased, such subscriber became a member of a syndicate, which, in the conduct of the syndicate business, might make or lose money. In nearly every well-known cited case (as above suggested), the person who alleges fraud seeks to recover back his money or other property, and the syndicate relation springs up from the start. Brewster v. Hatch, 122 N. Y. 349, 25 N. E. 505, 19 Am. St. Rep. 498 (which took the form finally of a suit to recover personal damages); Heckscher v. Edenborn, 203 N. Y. 210, 96 N. E. 441; Sim v. Edenborn, 242 U. S. 131, 37 Sup. Ct. 36, 61 L. Ed. 199.

The principles stated in these cases, and many analogous with them, are well enough known; but the case at bar does not present any such situation as was developed in any of these cases. The furthest to which the facts in this case lead is to prevent defendant from making a profit out of those plaintiffs who relied, and were justified in relying, on the representation that defendant was getting the stock for a figure other than he really paid. This is but another way of stating that those plaintiffs are entitled to the stock at the price which Megargel paid for it, and that, to that extent, he acted as their agent, and must be regarded as having bought the stock for these plaintiffs at $3.50 per share, and in so deciding I have not overlooked Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005.

Therefore there may be a decree in favor of plaintiffs Wyland, Parker, Brooks, Gregg et al., Wilson, Cranmer et al., Keeler Bros., Nicholson, E. A. Howard, and H. E. Howard, substantially in accordance with paragraph 4 of the relief asked for in the complaint. The decree, however, is to be worded so as not to include any accounting for or payment over to a given plaintiff of the difference between $7 and $3.50 in sales to other plaintiffs or persons. Nicholson will have the relief referred to in paragraph 5 of his demand for judgment.

The decree will provide that defendant will be enjoined from disposing, etc., of the nonwithdrawn stock necessary to cover the amounts deliverable to the various plaintiffs entitled to the same, as above provided. In those cases where the bill is dismissed, defendant may have a decree for his counterclaim.

[11] As to the accounting of the syndicate itself: This, it seems to me, is premature, and cannot be asked for until this decree (or any modification thereof) is carried out. I am unable to find any refusal

on the part of defendant fully and properly to account as the manager of the syndicate itself. On the contrary, the preliminary statement of account, furnished by defendant, does not show any intention to fail to account, and to undertake an accounting now would not only be premature, but result in an unnecessary expense. It is altogether likely that, at the proper time, defendant will furnish a full account.

The bill in this regard will be dismissed, without prejudice to any of the plaintiffs to the bringing of a new suit for that purpose if so advised. No costs.

NOTE.

Private and Confidential.

R. C. Megargel & Co., 27 Pine Street, New York City.

August 17, 1917.

The Glenrock Oil Company (Incorporated).

Capital Stock Syndicate.

To ————————:

Dear Sirs: 1. The Glenrock Oil Company (Incorporated) has been recently incorporated under the laws of the state of Virginia with a total authorized capital stock of $10,000,000, divided into 1,000,000 shares of the par value of $10 each. The corporation was organized for the purpose of acquiring by direct purchase, or through controlling interests in other corporations, producing and prospective oil properties located in the state of Wyoming and elsewhere.

2. We are negotiating for the purchase of certain shares of the capital stock of this corporation, and are forming a syndicate to acquire from us a portion of said stock to the extent of not exceeding 100,000 shares, when, as and if acquired by us, at a price of $7.00 per share.

3. The syndicate will terminate on October 15, 1917, subject to our right to dissolve it at an earlier date and to our right to extend it from time to time beyond said date for an aggregate period not to exceed sixty days.

4. We are to be managers of the syndicate and may be members thereof, notwithstanding our relations as vendors thereto and managers thereof, and as such managers we shall have full power to determine, within the limit above stated, the amount of stock to be purchased from us by the syndicate, and with full power to sell, purchase, resell and repurchase, for account of the syndicate, at public or private sale, any shares of stock at such prices and on such terms as we may deem fit; to pay the usual brokerages, as well as such commissions for effecting sales or purchases for account of the syndicate as we may deem proper; to charge the syndicate reasonable commissions and the usual brokerages for sales or purchases effected by us; to make advances to the syndicate, charging interest thereon; to make or procure loans and secure the same by pledge of syndicate stock or otherwise, to such amounts and in such manner as from time to time we may deem expedient; and generally to act in all respects as in our opinion may be to the interest of the syndicate. We shall not be liable under any of the provisions of this letter or for any matter connected therewith, except for want of good faith, and no obligation not herein expressly assumed by us shall be deemed to be implied.

5. The syndicate managers may purchase, sell or otherwise dispose of, or be interested in the purchase, sale or other disposition of, any stock or other securities of said corporation or its subsidiary companies, or contract in any respect with it or them, without restriction and without responsibility therefor to the syndicate.

6. All expenses incurred in the acquisition of such stock for the syndicate, in the marketing of the same, and all other expenses incurred by us as syndicate managers shall be charged against the syndicate. We shall make no charge to the syndicate for acting as syndicate managers, other than reason-

able commissions and the usual brokerages for sales or purchases effected by us, being otherwise compensated in our purchases of said stock.

7. Your total obligation shall not in any event exceed the amount of your participation as herein stated, but the failure of any participant to perform any part of his obligation hereunder shall not release any other participant. Nothing herein contained shall constitute the participants partners with the syndicate managers or with one another.    Syndicate participations are not transferable except with the written consent of the syndicate managers.  The syndicate managers reserve the right to cancel the participation of any member violating the syndicate provisions, and to hold him liable for any losses sustained by such violation.   The firm constituting the syndicate managers acts as a copartnership and all rights and powers hereunder of said firm shall vest in any copartnership which shall be the sole successor of said firm without further act or assignment.

8. We, as syndicate managers, may grant to, or withhold from, any syndicate participants the privilege of withdrawing their respective allotments of stock, or any part thereof, for investment.  No participant withdrawing stock shall be entitled in respect thereof to share in any profits of the syndicate. Applications to make such withdrawals, in whole or in part, must be made to us upon written acceptances of participation within the  period below provided, and any such application may· be refused or granted by us in such cases and to such extent as we may, in our discretion, determine.  In respect of your participation, or any part thereof, so withdrawn, you will be required to pay at the time and in the manner hereinafter provided an additional sum of one dollar per share on the number of shares so withdrawn to cover the proportion of the syndicate expenses attributable to such withdrawn participation.   Upon the completion of all payments in respect of such withdrawn stock, you will be entitled to receive an appropriate certificate, issued by or on behalf of the syndicate managers, reciting that you are· the owner of the number of shares specified therein and will be entitled to receive the same upon the termination of the syndicate.  No stock so withdrawn from sale by any participant shall be delivered to him until the termination of the syndicate.

9. *We have reserved for you, subject to the acquisition by us of such stock and to the reduction of such participation in case of oversubscription as hereinafter provided, a participation in the syndicate of ―――― shares of such stock, which, at the syndicate price of $7.00, amounts to $――――.*

10. Should you desire to accept such participation, please confirm your assent to the conditions as herein stated by signing the enclosed acceptance and return the same to us at No. 27 Pine street, New York City, on or before August 23, 1917, after which time all offers of participation not so accepted will be deemed refused and canceled.    This letter and your acceptance will thereupon constitute the contract between us.

11. All acceptances, in whole or in part, are subject to our approval, and in case of an oversubscription the syndicate managers shall have the right to allot to you such less amount of participation in the syndicate than the amount reserved as above stated, as they in their uncontrolled discretion may determine.

12. You will be required to make payment in New York funds in respect of your obligation hereunder to the syndicate managers at their office, No. 27 Pine street, New York City, on three days' previous notice stating the amount of participation in the syndicate allotted to you by the syndicate managers as above stated, mailed or telegraphed to you by us, against delivery to you at said office of subscription receipts representing your payment.   Such call may, in our discretion, be for full payment or for payment in installments.

   Yours truly,       ――――――, Syndicate Managers.