Nicholas M. Pette, J.
This action was begun on October 19,
1953, and issue was joined on March 11, 1956. The complaint, containing a separately stated cause of action against each of the six Clearview Gardens corporations herein, and a seventh cause of action against defendant, Spear & Co., Inc., an eighth cause of action against defendant Dwight-Helmsley, Inc., a ninth cause of action against the individual defendants and a tenth cause of action against all the defendants, was sustained by the Appellate Division, as to all the defendants, except Spear & Co., Inc., and Dwight-Helmsley, Inc., which are no longer parties to the action (285 App. Div. 969).
This ease came on for trial before me on March 7, 1957, and was tried on that day and on 13 subsequent dates, and after *472 calling 8 witnesses to the stand and after reading many pages of examinations before trial, and after plaintiff’s 113 exhibits and defendants’ 38 exhibits were received in evidence, on April 10, 1957, plaintiff rested its prima facie case.
At the close of plaintiff’s prima facie case, the defendants moved to dismiss, and, on May 13, 1957, this court rendered its decision denying that motion and directing that the trial be resumed on May 20, 1957 (N. Y. L. J., May 15, 1957, p. 11, col. 3). On defendants’ application, however, the trial was set down for and was resumed on May 21, 1957.
This has been an arduous and much protracted trial of a difficult action of great importance to both sides herein. The numerous exhibits introduced in evidence and the prolix testimony elicited and read from examinations before trial during the course of this trial, together with the several memorandums and several briefs submitted by the learned counsel for the parties herein, is unusually voluminous. The court has devoted and expended many days of painstaking effort in carefully examining and considering this tremendous mass of evidence adduced before it. The excellent memorandums and briefs of counsel and the elaborate arguments advanced therein, have been of much help to the court in the consideration of the evidence so very skillfully and ably presented by counsel for both sides.
It would be superfluous at this time to restate the material facts relating to the nature and substance of the plaintiff’s causes of action herein, since the same have been sufficiently set forth in the decision rendered by this court denying the defendants’ motion to dismiss at the close of the plaintiff’s case (N. Y. L. J., May 15, 1957, p. 11, col. 3, supra).
The Appellate Division established the law of this case upon the pleadings (285 App. Div. 969) and the evidence adduced by the plaintiff, aided and amplified by testimony elicited by the defendants on cross-examination, together with the testimony of other witnesses called by the defendants in presenting their alleged defenses herein, sustained all the material allegations of the complaint. The evidence does not sustain the contentions of the defendants and it has utterly failed to overcome the right of the plaintiff to recover in this action.
Defendants’ efforts, in injecting into this case testimony and evidence tending to show that tenant shareholders of the corporate defendants, have or may have certain claims against parties, who like said tenant shareholders are not parties to this action, and against the plaintiffs, which testimony and evidence the court allowed over the plaintiff’s objection and *473 exception, in this court’s opinion, cannot, and does .not avail the defendants as a defense. Said testimony and evidence had no bearing upon the issues raised within the framework of the pleadings herein, and it definitely failed to establish any defense to the plaintiff’s causes of action against the defendants herein.
Succinctly stated, the defendants have sought to defeat plaintiff’s right to recover herein by contending that (A) because of alleged fraud on the part of the builders of the housing-projects involved in this action (who, incidentally, are not parties to this action), plaintiff is barred from recovering either the quarters or the patronage refunds plaintiff claims herein; (B) that the current available assets were withheld from tlae plaintiff by the defendants, in order to meet corporate obligations of the corporate defendants herein claimed to have arisen because of alleged construction defects and anticipated sewer assessments; and (C) that the testimony and evidence (either on the witness stand, or offered by stipulation of counsel in lieu of their appearance) of about 287 of the tenant shareholders, has cured the inability of the corporate defendants to now urge herein in their own defense the claims of said tenant shareholders against the plaintiff. As already stated, this testimony and evidence was allowed by the court over the plaintiff’s objection and exception, and the court again notes that none of said tenant shareholders or any of the other tenant shareholders of the corporate defendants, who all told number approximately 1,800 occupant shareholders, are parties to this action.
The defendants cite and rely upon the Northridge and Knolls decisions (2 N Y 2d 514) as authority in support of their affirmative defense of fraud in this action, which defense was contained in the amended answer interposed and submitted at the beginning of this trial.
As Judge Van Voobhis clearly stated in the opinion in the Northridge and Knolls cases (supra) both appeals in those cases were from nonfinal orders entered upon motions addressed to the complaints. In the Knolls case the motion was to dismiss several of the causes of action by summary judgment. In the Northridge case the motion was to dismiss the complaint for insufficiency and lack of legal capacity to sue, and for other complicated relief, but all that was raised on the appeal was the striking out of some of the allegations as sham.
In the opinion of this court the cases of Northridge and Knolls (supra) do not support the contentions of the defendants in the case at bar, nor do they support the propositions for *474 which the defendants cite them. There had been no trial at which proof to establish plaintiff’s charges had been presented for adjudication in those cases. Whether the facts which plaintiffs might be able to prove in those cases would warrant the inference and conclusions required for judgment in favor of the plaintiffs, was and still remains an undetermined question. The most that the Northridge case held was that if the promoters of the projects involved there made unreasonable profits and the tenant shareholders were damaged thereby, the promoters must account for profits of that nature. The courts have consistently held that one in a fiduciary relationship must account. However, that does not mean that by so holding the court has determined that the fiduciary is guilty of fraud. The liability, if any, of the fiduciary is not prejudiced by a judgment directing him to account, nor does it establish that he has been guilty of fraud or wrongdoing. As to this, Judge Yaw Yoobhis was very careful in the choice of the language used in his opinion.
Damage is always one of the essential elements of fraud (Hanlon v. Macfadden Pub., 302 N. Y. 502 and cases cited therein). It is significant that no damage was proven in the case at bar, but to the contrary, the evidence affirmatively established that neither the defendants nor the tenant shareholders has suffered any damage whatsoever. In the conspiracy case in the Supreme Court, New York County, in which a decision is now pending, a judgment directing an accounting would not establish damage, or the existence of profits, or that the co-operatives or the tenant shareholders were entitled to share in claimed profits. Fraud is an affirmative defense which the party claiming it has the burden of proving. The evidence presented before me has failed to establish the defendants’ contentions, or that any fraud, as alleged in the amended answer, was committed or existed. Furthermore, had the evidence established said contentions they could not' avail defendants nor serve to defeat or diminish the plaintiff’s recovery in this action.
The court is aware of the crucial need and crying demand for housing, and it well remembers the plight of returned war veterans unable to obtain the same. As the evidence here disclosed, veterans living in obsolete wartime frame barracks, or doubling up with their already crowded relatives, were insistently seeking new housing long before the builders of these Clearview Hardens houses came into the picture. Many methods of attempting to alleviate this deplorably critical and growing need for housing were set up by legislation, such as *475 limited dividend corporations under State law, municipal housing projects, rental housing, and finally co-operative housing under section 213 of the National Housing Act. Some of these methods relied on Government grants and privileges, but section 213 of the National Housing Act was based upon the profit motive. It is apparent, that Congress, to accomplish the desired result of creating new housing, contemplated and relied upon the profit to the promoters as the incentive to encourage private money and private enterprise to venture upon such undertaking. Participation on the part of the Government, under section 213, was confined to the guarantee of the mortgage loan to be obtained. The builders of the Clearview Gardens projects became interested because of such profit motive, precisely as Congress intended that they and others like them should find it interesting to participate.
As Mr. Justice Callahan stated in Northridge Co-op. Section No. 1 v. 32nd Ave. Constr. Corp. (286 App. Div. 422, 426-427, quoted with approval by the Court of Appeals, 2 N Y 2d 514, 523-524, supra):
“ A perusal of section 213 of the National Housing Act and the regulations issued thereunder discloses that the law, while it relates principally to the insurance of mortgages by the Federal agency, contemplates a method for the promotion of the construction of co-operative housing units by private sponsors. * * *
“ That the element of private sponsorship on a basis of profit to the promoters was contemplated as to the co-operative as well as the privately owned housing projects seems evident from a reading of the statutes and the regulations issued thereunder. * * * if promoters were to make profits, and, con-cededly, they were entitled to do so, they would have to be made in connection with the sale or lease of the land and the arrangement of the price for construction ■ of the buildings.” (Emphasis supplied.)
There is no gainsaying, that without plaintiff’s financial assistance to the defendants’ tenant shareholders or occupant shareholders as they are also called, the apartment houses involved in this action could not have come into existence. Whatever may have transpired between plaintiff and parties not litigants in this action, including said tenant shareholders, builders and others, cannot avail the defendants in their attempt to defeat plaintiff’s right to recover herein.
The tenant shareholders have had the use and benefit of the moneys advanced by the plaintiff in their behalf and which they formally agreed to repay in the form of the quarters and *476 patronage refunds plaintiff seeks to recover from the corporate defendants, which agreed to collect and receive them for the benefit of the plaintiff. The corporate defendants, who to all practical intent and purposes may be considered as “ stakeholders ” of said funds for the use and benefit of the plaintiff, withhold payment of said quarters and patronage refunds from the plaintiff, by contending:
(1) that the construction costs were too high;
(2) that the ground rent was too large;
(3) that there was self-dealing in negotiating the construction contracts and the ground lease;
(4) that the occupant shareholders were not informed of the amount of or terms and conditions of the construction contracts;
(5) that the occupant shareholders were not informed of the terms of the ground lease;
(6) that the occupant shareholders were not informed of the interest of the Pravers and the Kahns, or the interest or employment of Mr. Weisman;
(7) that therefore the co-operatives and the occupant shareholders are free from the obligations they assumed.
It will be observed that all of the foregoing contentions are urged in behalf of the tenant shareholders (who are not parties to this action), to justify the failure and refusal of the corporate defendants to pay plaintiff the quarters collected by said corporate defendants, which the evidence discloses amounted to $103,859 as of December 31, 1956, and patronage refunds in the sum of $358,391.15 which the evidence discloses were available for payment to plaintiff pursuant to the agreements therefor as of June 30, 1953, and in addition thereto the quarters collected from January 1, 1957 to date, which with the other quarters were all earmarked for payment to the plaintiff.
Now that the gigantic development has been completed, the housing supplied, and the buildings fully occupied, all under the close supervision of the Federal Housing Administration (FHA), and that the tenant shareholders have had the use and benefit of the plaintiff’s money, it would appear to this court to be inequitable for the corporate defendants to withhold payment to the plaintiff upon the aforesaid contentions, which this court finds to be without merit and unsupported by the evidence adduced before it.
The evidence discloses that there was no concealment about the manner in which construction prices were fixed, and the reasonableness of the costs arrived at is sustained by the testimony of Mr. Campbell of the FHA. The evidence also shows *477 that the ground rent was properly fixed and that it was not too high. There was no fraud shown in connection with the fixing of the construction costs and the ground rent.
The defendants have made no claim that any of the builders, or Olearview Associates, Inc., made false representations at any time to any person or persons. The representations that were made to the tenant shareholders were contained in the brochure distributed at the renting office on Queens Boulevard, and later at the renting office on the site. There is not the slightest claim that anything contained in such brochure was false, misleading or untrue. The alleged fraud charged appears to be the failure to disclose facts that, it is claimed, the builders were under a duty to disclose to the tenant shareholders, because of the alleged fiduciary relationship which they held towards the tenant shareholders. In this connection, however, no claim has been made that the builders withheld any information that was requested.
While defendants have asserted that there was self-dealing in negotiating the construction contracts and the ground lease, they have failed to show how they could have possibly been fixed in any other way than was actually done. The land has to be assembled and devoted to the project, the co-operative corporations had to be created and organized, the construction contracts had to be made. Who, if not the builders’ group were to take care of such matters, and who except the builders and the FHA was there to bargain?
The applicants (tenant shareholders) were interested in the cost of their apartment (which they were told would not exceed $200 a room), the amount of cash they would have to put up (which they were told would be $30 a room), how they were to pay the balance (which they were told would be advanced to them by Olearview Associates, Inc.), how they would repay the advances (which they were told would be from quarters and the patronage refunds), and the amount of the carrying charges (which were specified in detail in the occupancy agreement). They were given complete information about all of this and were fully satisfied. Beyond these factors they cared nothing and asked nothing.
Had the applicants read or been informed about the construction contracts, the ground leases, and informed about the interests of the Pravers and the Kahns, as well as the interest and employment of Weisman, they would have learned the facts disclosed by the evidence, i.e., that the construction contracts were fair, and substantially lower than the figures that the FHA was willing to approve, and that the ground leases were *478 exceptionally favorable to the co-operatives. Upon the evidence before this court, the defendants’ claim that the alleged fraud of the builders entitle them to retain and refuse to pay plaintiff the quarters and patronage refunds belonging to the plaintiff and available for that purpose, as hereinabove stated, is untenable and inequitable.
The determination in the conspiracy case before Mr. Justice Coleman, in the Supreme Court, New York County, cannot affect or defeat plaintiff’s right of recovery here, because the conspiracy action was based upon an affirmance of the contracts and agreements that were entered into and performed. Clearview Gardens First Corp. v. Weisman (206 Misc. 526, affd. 285 App. Div. 927) shows this. In that case the complaint in the same conspiracy action was before the court on a motion by the defendants to strike the action from the jury calendar on the ground that it stated causes of action in equity, rather than in law. The motion required the court to analyze the nature of the causes of action therein and the recovery sought. The motion to strike out was granted, and Steuer, J., at Trial Term said: ‘‘ It is quite clear that the wrong plaintiffs complain of is that the defendants dealt with themselves to their own benefit and the consequent detriment of the plaintiffs. What is not so clear is whether the relief sought is the recovery back of the excessive costs and rentals paid or the amounts defendants were able to borrow on mortgage in excess of the true value of the buildings because of the inflated price of construction and the excessive rentals. * * * The complaint apparently affirms all the agreements as the most conspicuous omission is a failure to ash to be relieved of the contracts ”. (206 Misc. 528, emphasis supplied.)
A party to a contract is not damaged by a contract which he has not performed and which is not enforcible against him. The other party is not unjustly enriched by a contract under which he has received nothing and which he is not entitled to enforce. It is only where the contract is enforcible, or where the complaining party has performed, that the alleged defrauding party can be required to account, or to respond in damages. The same thought was expressed by Judge Van Voorhis in the Northridge case (supra, p. 527) which was also a motion involving the pleadings, where he said: ‘1 What has been said is subject to the qualification that where additional stock is contemplated to be issued by a corporation to uninformed outsiders, or the public is to be invited to become _ original subscribers for the stock in a corporation, and this intention or plan is carried out, the promoters must account to the *479 Corporation for profits of this nature ”. This statement could only apply where the complaining party has affirmed the contract alleged to have been fraudulent or otherwise voidable.
The law is clear that a person who has been induced through fraud to enter into a contract, has the option either to disaffirm the contract and return or tender back the consideration he has received, or to affirm the contract, and sue or counterclaim for the damages he has sustained. (Heckscher v. Edenborn, 203 N. Y. 210; Sager v. Friedman, 270 N. Y. 472.) He cannot retain the consideration he has received and refuse to perform the obligations imposed upon him by the contract. (Merry Realty Co. v. Shamokin & Hollis Real Estate Co., 230 N. Y. 316.) He may rescind his purchase and sue to get his money back, or he may keep his purchase and sue to recover damages for fraud. He cannot do both. (Brennan v. National Equitable Investment Co., 247 N. Y. 486.) This principle applies to the defendants here, and completely destroys their defense.
For instance, it might well turn out that an accounting, even if it should be ordered in the conspiracy action in the Supreme Court, New York County, would show that no unreasonable profits had been earned, that the co-operatives had sustained no damage, and that the plaintiffs in the conspiracy action were entitled to no monetary recovery. In such event, Clear-view Associates, Inc., if denied recovery here, would lose out-of-pocket over $1,000,000, and the defendants and the tenant shareholders would be correspondingly unjustly enriched. To permit the defendants to affirm the contracts in said conspiracy action and recover moneys, and, simultaneously, disaffirm the contracts and repudiate the obligations imposed upon them by the contracts in the case at bar, would be inequitable and contrary to every precept of law.
The plaintiff made no construction contracts; it owned no land; it held no ground leases; it leased no apartments; it sold no stock to the tenant shareholders or to the public; it solicited no stock subscriptions. As the contract for advances stated, its function was merely “ to assist the applicant * * * to become a full-fledged occupant-shareholder of said Clearview Gardens.” For this purpose it agreed “ to supply such cash as may be required by Clearview Gardens by advancing for the applicant the proportionate amount of such cash attributable to the applicant’s apartment,” not to exceed $200 a room.
The representations concerning the plaintiff’s advances were fully set forth in the brochure which reads: “ The cash which you are asked to invest is the lowest on record. Such additional *480 cash as the FHA requires to assure completion of the. project will be advanced in your' behalf under a contract which sets forth that your entire obligation to repay such advances, is to add 25 cents per room per month to the schedule of monthly charges approved by the FHA and to assign all ‘ cash patronage refunds ’ to which you will be entitled by reason of the occupancy of your apartment, until the amount advanced in your behalf is paid back without interest or other charges of any kind whatever. Please note that the schedule of monthly charges printed on the first page already includes the additional 25 cents referred to above.”
No criticism appears to have been made of the aforesaid representations. No claim that they were false in fact, or known by plaintiff to be false, or that the tenant shareholders or Clearview Gardens were damaged in relying upon them.
Cases are few and far between where the corporate status of a New York corporation has been disregarded and the corporation has been deprived of the right to enforce the contracts that it has made — and the court knows of none in a case such as this. The plaintiff exists as a corporation and has its own assets and property, its own officers and directors, and was formed for a legitimate purpose, known to the defendants and to every tenant shareholder. Plaintiff appears to have fully carried out that purpose.
Wrongs, if any, committed by controlling stockholders do not justify a disregard of the corporate entity or constitute a defense to the enforcement of its contracts made with other parties. (Berkey v. Third Ave. Ry. Co., 244 N. Y. 84; Bartle v. Home Owners Co-op., 309 N. Y. 103.)
Defendants here assert the novel proposition that the plaintiff was a mere agent or agency of the builders. That is to say, that the alleged agent has been charged with responsibility for the acts of the alleged principal. (Rapid Transit Subway Constr. Co. v. City of New York, 259 N. Y. 472, 489.)
The court has been unable to find any evidence of fraud, misrepresentation or illegality on the part of the plaintiff. The builders’ purpose in placing the lending operation in a separate corporation was a legitimate one, which harmed or deceived nobody, and was clearly within the limits of the public policy of the State of New York (Bartie v. Home Owners Co-op., supra, p. 107).
The defendants’ contention that plaintiff loaned the tenant shareholders their own money, is without merit, for the very reason why the plaintiff had to lend the money was because the tenant shareholders did not have (or were supposed not to *481 have) the money necessary to satisfy the FHA requirements for cash above the mortgage, and that they were financially unable to pay more than the initial $30 a room. This is disclosed by a mass of evidence in this case concerning that subject. The evidence showed that the money with which these advances were made came from the Irving Trust Company and the Bank of Manhattan Company. The Irving Trust Company loaned the money to Little Bay secured by the indorsement or guarantee of the individual developers and their families and certain collateral. Little Bay then loaned the money to the plaintiff. Similar arrangement was made with the Bank of Manhattan Company, except that the loan was made to H. R. H. Construction Corporation, which loaned the money to Little Bay. These were ordinary banking transactions, and there was nothing unusual about them, and if any element of fraud had been present, neither the Irving Trust Company nor the Bank of Manhattan Company would have risked their money in them.
For all of the reasons herein stated the defendants’ claim of fraud completely fails and has no basis in the evidence presented at this trial.
The defendants’ claim that the patronage refunds available for payment to the plaintiff as of June 30, 1953 and amounting to $358,391.15, were withheld from the plaintiff in order to meet corporate obligations of the corporate defendants arising because of the alleged construction defects and future sewer assessments, is sham and clearly contradicted by the evidence, which shows that this money was deliberately returned to the tenant shareholders in the form of inadequate carrying charges. The evidence showed that sewer assessments were not levied until January, 1957, and if paid at all, could not possibly have been paid prior to that date. As for payments on account of alleged construction defects, the evidence also showed (a) that the heating equipment program was not begun until 1955 and was completed in 1956 and that the total cost thereof was $65,-000; (b) that the domestic hot-water program had been under way since March, 1956, and will cost, when completed in 1958, about $23,000; (c) that the verger boards are now being modified and will cost $20,000; (d) and the program for renewing the boilers was undertaken in 1956 and the cost will be about $41,000. Of all the receipted bills produced showing payments on account of alleged construction defects, the earliest paid was in June, 1955, and that by that time the patronage refunds of $358,391.15 which existed on June 30, 19'53, had been completely returned to the tenant shareholders. With respect to the First *482 and Fifth Corporations, the accountants’ reports showed that the amount of said corporate defendants’ patronage refunds were gone as early as March 31, 1954, and for the Second, Third, Fourth and Sixth Corporations, they were gone by July 31, 1955, with the exception of about $6,500 in the Second and Sixth Corporations, which were gone by August 31, 1955.
The evidence also disclosed that under the FHA regulations and the by-laws (art. V, § 1), there was a required reserve fund for replacements “ for the purpose of affecting replacements of structural elements and mechanical equipment of the project,” totalling, for the six corporations, some $23,345.92 a year. This reserve was set up and has been regularly maintained and increased, as the reports of the accountants show, and formed no part of the current available assets from which patronage refunds were payable, and on December 31, 1955, these reserve funds for replacements totalled $55,438.71. The evidence further disclosed that the corporate defendants used the reserve funds required by the FHA for expenditures incurred' on the heating rehabilitation program instead of using current available assets for said purpose, and that there was never any need or occasion for retaining and withholding the patronage refunds from the plaintiff because of the alleged construction defects. Furthermore, performance of the construction contracts was secured by indemnity bonds executed by the individual developers of these housing projects and their families, totaling $1,785,211. No claim has been made that the indemnitors were not good for whatever amounts might have been required. The evidence also disclosed that completion agreements were secured by completion bonds issued by Massachusetts Bonding & Insurance Company and Manufacturers Casualty Insurance Company totalling $120,707 and that off-site contracts were likewise secured by performance bonds issued by the Massachusetts Bonding & Insurance Company, in the sum of $783,780. There is no claim that these corporate sureties were not financially responsible, or that the bonds were inadequate in amount.
The truth of the matter appears to have been expressly stated by Sokol, the president of these corporate defendants, in his testimony upon an examination before trial in the conspiracy action in the Supreme Court, New York County, which was read into the record of the case at bar, when he said in substance, that the corporate defendants were collecting carrying charges from the tenant shareholders, which were not high enough to carry the projects, and that the corporate defendants were using the patronage refunds available to make up *483 the deficit. This is further evidenced by the plaintiff’s Exhibit 553. All this evidence established that no part of the sum of $358,391.15 available for patronage funds on June 30, 1953, was reserved or retained or used for the payment of the cost of repairing the alleged construction defects, or for paying the sewer assessments, but showed that the entire sum of $358,391.15 was distributed to the tenant shareholders in the form of inadequate carrying charges, long before any payments were made by the corporate defendants in curing the alleged construction defects.
The court is satisfied that the defendants, and each of them, converted said sum of $358,391.15, and are liable for that amount, with interest (Debobes v. Butterfly, 210 App. Div. 50, 55; Mendelson v. Boettger, 257 App. Div. 167, affd. 281 N. Y. 747; see, also, Lamb v. Cheney & Son, 227 N. Y. 418; Campbell v. Gates, 236 N. Y. 457; Gonzales v. Kentucky Derby Co., 197 App. Div. 277, affd. 233 N. Y. 607).
The plaintiff’s prima facie case against the individual officers and directors of the corporate defendants and against the corporate defendants herein is fully sustained by all the evidence in this case, and their attempted defense has utterly failed.
The corporate defendants, under the issues framed by the pleadings, made claim to both the quarters and the patronage refunds for their own benefit and in their own right, and continued to claim them throughout the trial. The claims urged by defendants’ counsel in favor of the tenant shareholders were contingent ones, to arise only in case this court should decide adversely to the corporate defendants. And it is only in the event that judgment should be rendered adversely to the corporate defendants, that the individual tenant shareholders make a claim. Under the occupancy agreements they signed, the tenant shareholders agreed, inter alla, to pay the quarters to Clearview Gardens for transmission to the plaintiff and they are bound thereby and must be required to perform the obligation they assumed thereunder. But in any event, they are not parties to this action and they can have no standing before this court, and as already stated the defendants cannot urge the claims of the tenant shareholders, if any, against the plaintiff, in defense of their refusal to pay plaintiff said quarters and patronage refunds.
Full knowledge or notice of the facts in this case was brought to the tenant shareholders at the Bayside School meeting on October 7, 1952, and from that time none of them could possibly claim that he was deceived or kept in the dark. In *484 the almost five years that have passed since that meeting, each tenant shareholder has owned, held and enjoyed a share of stock which he has retained and has occupied an apartment and enjoyed the benefits thereof. None has offered to return the stock, or to surrender the apartment, or to rescind the agreement they entered into with the plaintiff, and many have further evidenced their desire to continue to enjoy such benefits, by moving from one apartment and taking another. Upon such a state of facts none of these tenant shareholders can be excused from performing the obligations of their contracts. Rescission must be denied as a matter of law (Tomoser v. Kamphausen, 307 N. Y. 797, 802, and cases cited therein). None of them have, or under any contingency can have, any rights to the quarters or to the patronage refunds.
Who in reality seek that to which they are not entitled, if not the defendant corporations herein and their tenant shareholders? The corporate defendants seek to profit $103,859 (the quarters) for themselves, in contravention of their articles of incorporation and the statute to which they owe their existence (San Joaquin Val. Poultry Producers’ Assn. v. Commissioner of Internal Revenue, 136 F. 2d 382). The tenant shareholders would own their apartments at a cost of only $30 a room, less their proportion of the patronage refunds of $358,391.15 that were returned to them in the form of reduced carrying charges, plus the damages they hope to recover in the conspiracy action in the Supreme Court, New York County. Thus, the plaintiff’s advances would stand irrevocable, but the repayment clauses would-be destroyed. Nothing in contracts, in law, or in equity entitles said tenant shareholders to such benefits. To permit them to thus become unjustly enriched would be repugnant to every principle of law and equity.
After this court had rendered its decision denying the defendants’ motion to dismiss at the close of the plaintiff’s prima facie case (N. Y. L. J., May 15, 1957, supra), and when the trial was resumed on May 21, 1957, defendants’ counsel moved on behalf of some of the tenant shareholders of the corporate defendants to intervene in this action. The plaintiff strenuously objected to the motion, which was oral, and the court then reserved decision thereon. A motion on behalf of the tenant shareholders to intervene in this action was also made at Special Term, Part I, and that motion was referred to this court. Under all the evidence and circumstances appearing in this case, orderly procedure and equitable practice cannot sanction the granting of said motions, and this court now denies said motions.
*485 The court has been ranch impressed by the character, credibility and weight, of the, evidence addjtced on behalf of the plaintiff in this action, and is convinced and is of the opinion that it has clearly established plaintiff’s right to recover against all the defendants in this action. Accordingly, judgment is hereby granted in favor of the plaintiff as follows:
(1) against the defendant Olearview Gardens First Corporation and the individual defendants in the sum of $46,948.22 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $22,543, the amount of the quarters collected to December 31, 1956, with interest from the respective dates of collection thereof, plus the amount of the quarters collected from January 1, 1957 to date, with interest thereon from the respective dates of collection;
(2) against the defendant Olearview Gardens Second Corporation and the individual defendants in the sum of $54,922.72 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $13,900, the amount of the quarters collected to December 31,1956, with interest from the respective dates of collection thereof, plus the amount of the quarters collected from January 1, 1957 to date, with interest thereon from the respective dates of collection;
(3) against the defendant Olearview Gardens Third Corporation and the individual defendants, in the sum of $51,446.57 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $11,494, the amount of the quarters collected to December 31, 1956, with interest from the respective dates of collection thereof, plus the amount of the quarters collected from January 1, 1957 to date, with interest thereon from the respective dates of collection;
(4) against the defendant Olearview Gardens Fourth Corporation and the individual defendants, in the sum of $105,169.81 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $19,735, the amount of the quarters collected to December 31, 1956, with interest from the respective dates of collection thereof, plus the amount of the quarters collected from January 1, 1957 to date, with interest thereon from the respective dates of collection;
(5) against the defendant Olearview Gardens Fifth Corporation and the individual defendants, in the sum of $26,299.34 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $11,596, the amount of the quarters collected to December 31, 1956, with interest from the respective dates of collection thereof, plus the amount of the quarters *486 collected from January 1, 1957 to date,.. with interest thereon from the .respective dates of collection;
(6) against the defendant Clearview Gardens Sixth Corporation and the individual defendants, in the sum of $73,604.49 for the patronage refunds, with interest thereon from June 30, 1953, plus the sum of $24,588, the amount of the quarters, collected to December 31, 1956, with interest from the respective dates of collection thereof, plus the amount of the quarters collected from January 1, 1957 to date, with interest thereon from the respective dates of collection.
The claim of the defendants by way of a setoff, is untenable and without merit, and is therefore dismissed.
The plaintiff is also entitled to costs, hereby awarded.
The foregoing constitutes the findings of fact and conclusions of law and decision of the court, pursuant to section 440 of the Civil Practice Act.
Submit the judgments to be entered herein.